**Gregory N. ALDRIDGE, Plaintiff-Appellee,**

v.

**Andrew MULLINS, Defendant-Appellant.**

**No. 72–1681.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 6, 1972.

Decided March 6, 1973.

James H. Harris, III, Metropolitan Atty., Nashville, Tenn., on brief, for defendant-appellant.

Lionel R. Barrett, Jr., Nashville, Tenn., on brief, for plaintiff-appellee.

Before KENT, Circuit Judge, and McALLISTER and O'SULLIVAN, Senior Circuit Judges.

PER CURIAM.

This is an appeal after a trial to the Court without a jury which resulted in a judgment for the plaintiff-appellee for $10,000 compensatory damages and $3,000 punitive damages. The parties will be referred to as in the court below.

Suit was brought by the plaintiff after he suffered a gunshot wound on September 30, 1970. The facts are in dispute, but viewing the evidence in the best light for the plaintiff it appears that he and

some other young people, some less than and some more than 21, were engaged in some horse play at about 11:00 p. m. on the day in question. The defendant is a police officer in the Metropolitan Police Department of Nashville and Davidson County, Tennessee. Defendant and his partner were cruising in a motor vehicle when they saw some individuals, never identified, in the vicinity of a closed office building. They had no report or evidence that any crime had been committed. Defendant and his partner stopped their cruiser, the individuals ran, and shortly thereafter defendant saw the plaintiff in a field in the area. Plaintiff claims that he was shot at this time. This is denied by the defendant, although the defendant admits that he fired his gun. There was no evidence of any other shooting of any gun involving or near the plaintiff at any other pertinent time.

█ In his appeal the defendant claims the trial court's findings of fact were clearly erroneous when the Court concluded that the plaintiff was shot by the defendant, that the circumstances of said shooting amounted to a breach of the plaintiff's Constitutional and Civil Rights in violation of Title 42 U.S.C. § 1983. The defendant also asserts that the trial court was in error in awarding punitive awards.

█ After full consideration of the record, the briefs and arguments of counsel, we are satisfied that the trial court's findings of facts are not clearly erroneous and that under the circumstances surrounding this shooting, where the defendant had no reason to believe that a crime had been committed and no justification for drawing his gun, and certainly no justification for firing his gun, the award of punitive damages was not error. We find no other allegations of error which require discussion.

The judgment of the District Court is affirmed.

O'SULLIVAN, Senior Circuit Judge (dissenting).

Respectfully, I dissent. I do so because the evidence that the bullet re-moved from the plaintiff's leg had not been fired from the gun of the defendant police officer was uncontroverted. *Plaintiff* put in testimony by a ballistics expert who examined the bullet in question. His testimony included the following:

"A. The bullet in question, of course I identified as being of .38 Special calibre. It contained a copper covering, or copper coating. By weight, it weighed 152.56 grains, which would identify it as being a standard 158 grain bullet. The rifling, or type of rifling on there was right-handed five groove. The bullet found to be actually under microscopic examination to be too deformed for any type of comparison examination other than to note the land and groove widths were of approximately the same width as those on the known bullets."

The following was part of the expert's cross-examination:

"Q. Are you familiar with the brand of ammunition called Super Vel?

"A. Yes, I am.

  * * * *' * *

"THE WITNESS: The actual weight of the unknown bullet, 152.56, which a bullet doesn't come in that weight. It would come in 158 grain. So judging from the appearance of the bullet, it would initially have been a 158 grain bullet.

 * * * * * *

"Q. Mr. Goodwin, what is the weight of the bullet in the Super Vel cartridge?

"A. 110 grains.

 * * * * * *

"Q. Now, based on your examination, are you able to tell whether the bullet that was removed from Gregory Aldridge's leg was a Super Vel bullet?

"A. I would say in my opinion it is not a Super Vel bullet.

 * * * * * *

"Q. Do you have known bullet specimens of 110 and 200 grain cartridges of the type we talked about with you?

"A. At the time these items were submitted, there was submitted two Super Vel bullets and two 200 grain Western bullets.

\* \* \* \* \* \*

"Q. Now, I believe you testified that the slug removed, or the bullet removed from Gregory Aldridge's leg, in your opinion, was not a 110 grain Super Vel bullet. Is that correct?

"A. That's correct.

\* \* \* \* \* \*

"Q. So, for all practical purposes, the slug identified as a plaintiff's exhibit is intact?

"A. Yes.

"Q. An accurate representation of a 158 grain slug?

"A. Yes, Sir."

The defendant testified that the only bullets in his gun at the time he fired two warning shots in the air were 110 grain Super Vel type. There was unchallenged evidence that at the time of the involved event the only bullets used by, or issued to, the officers of the Metropolitan Police Department of Nashville were 110 grain Super Vel. Heavier bullets, 158 grains, formerly used by such department, had been discontinued prior to 1960. The shooting here involved occurred on September 30, 1970, some ten years after the use of the heavier bullets was discontinued. Thus, the evidence that the only bullets fired by defendant were 110 grain Super Vel and that the bullet which was extracted from plaintiff's leg was not such a bullet, was in no way impeached nor was its probative worth impaired. The District Judge's contrary factual finding was, in my view, clearly erroneous. The reasoning by which the District Judge attempted destruction of this clear evidence is set out in his memorandum opinion as follows:

"7. Although police records were available, no records were introduced to show the kind and the amount of ammunition defendant requisitioned after the incident in question. Such records of ammunition requisitioned, being available to defendant and in the custody and control of defendant's employer, would have constituted the best evidence of the ammunition requisitioned by defendant.[4]

"[4.] According to Captain York's testimony, such evidence would have consisted of a card filled out by the police chief's secretary which approved such a requisition of replacement ammunition."

Respectfully, I submit that such reasoning was invalid. There had been no inquiry of defendant or anyone else as to the actual requisitioning by defendant of bullets to replace those fired at the time of the incident in question. The Captain York referred to in footnote 4 testified as to the procedure for the requisitioning of bullets to replace those fired by an officer, and said:

"[T]he Chief of Police's secretary prepares a little three by five card which she sends to me, since I maintain ammunition supplies, and when I receive that notification that they have been notified of a round expended, then I am authorized to issue to the officer.

"Q. Would it be fair to say that every bullet is accounted for in this manner?

"A. Yes, Sir."

I cannot read the foregoing as in any way supporting an inference that Officer Mullins had used other than the only authorized ammunition when he fired two shots from his revolver. Neither does it support an inference that defendant had fired more than two shots, nor that he requisitioned more than two bullets to replace those fired. Plaintiff's evidence included the claim that three shots were heard at or about the time plaintiff and two others ran away following, or as part of, the "horseplay" referred to in the majority opinion. If there was a third shot which struck plaintiff's leg, it did not come from defendant's gun. Plaintiff's two companions were identified but neither of them was produced. Plaintiff said that as to

one of them he last heard of him as being in San Francisco. A stipulation was entered as to the other (Dorris M. Victory) that if called he would testify that at about 11:00 o'clock on the evening in question he was in the company of the plaintiff, and at that time:

> "[He]. and Gregory Aldridge became separated and he observed Gregory Aldridge run into some tall weeds on an overgrown vacant lot. He lost sight of Aldridge in the weeds and proceeded on his way. Very shortly thereafter he heard *two shots* fired and he immediately left the area." (Emphasis supplied.)

This corroborates defendant's testimony that he fired only two shots. At trial plaintiff testified:

> "We wasn't going nowhere. I mean nowhere particular. We just ran down through the back of the yard over here at the Maxwell's house and went down the alley and then we just stopped down there behind a car lot down below my house.

> \*    \*    \*    \*    \*    \*

> "Now, when did you cross Nolensville Road? How many minutes had elapsed from the time you left the Maxwell's house until you crossed Nolensville Road?
> "A. Oh, about two to three minutes.
> "Q. Were wou walking or were you running?
> "A. We were running.
> "Q. And why were you running?
> "A. We was just running from my brother.
> "Q. And why were you running from your brother?
> "A. Because we were just running from him. There wasn't no reason. He just asked us to come home. We were just cutting up with him."·

There was a further stipulation that the plaintiff Aldridge "was convicted on two counts of robbery with a deadly weapon on 26 October, 1970," and that "for these crimes he was sentenced to serve two concurrent sentences of ten (10) years each in the State Penitentiary." The record does not disclose when plaintiff Aldridge had committed the above felonies—whether before or after his alleged deprivation of civil rights in the incident of September 30, 1970.

My own reading of the total factual story would leave me in grave doubt that it justified conviction of defendant of the misconduct which the District Judge found and which prompted him to award punitive damages. My view of the above discussed, and unchallenged, exculpatory proofs makes it unnecessary, however, that I consider whether the District Judge's findings were otherwise clearly erroneous.

I would reverse the District Court judgment and direct entry of a judgment of no cause of action.