Oscar J. FERNANDEZ, etc., et al., Plaintiffs, Appellees,

v.

Francis T. LEONARD, Defendant, Appellant.

No. 85–1403.

United States Court of Appeals, First Circuit.

Argued Dec. 2, 1985.

Decided March 6, 1986.

Jeffrey R. Martin, Asst. U.S. Atty., with whom William F. Weld, U.S. Atty., were on brief for defendant, appellant.

Leonard Glazer with whom Russell R. Weddell were on brief for plaintiffs, appellees.

Before COFFIN, BOWNES, and TOR-RUELLA, Circuit Judges.

BOWNES, Circuit Judge.

This is an interlocutory appeal from a denial of defendant-appellant's claim of absolute and qualified immunity made by way

of a motion for summary judgment. The defendant, Francis Leonard (Leonard), is a special agent of the Federal Bureau of Investigation. The district court approved the recommendation of the magistrate finding that there were genuine issues of material fact as to whether defendant's conduct violated plaintiffs' constitutional rights. The district court, through the magistrate, also found that on the plaintiffs' version of the facts there was neither absolute nor qualified immunity. We have jurisdiction of the appeal under the Supreme Court's decision in *Mitchell v. Forsyth,* —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), which held "that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Id.* 105 S.Ct. at 2817. *See also Krohn v. United States,* 742 F.2d 24 (1st Cir.1984).

This case arises out of the shooting and killing of Oscar V. Fernandez (Fernandez) by defendant and police officers in the course of apprehending two kidnappers. Plaintiffs Oscar J. Fernandez (Oscar), the son and administrator of the estate of his deceased father, and Rosa Fernandez, wife of the deceased, are seeking damages against the defendant, four members of the Brookline Police Department, and the Town of Brookline, Massachusetts, for the death of Fernandez. Plaintiffs' complaint states ten claims under the federal Constitution and the law of Massachusetts. Claim I is brought by Fernandez's estate for alleged violations of Fernandez's constitutional rights to freedom from "an unwarranted invasion of personal liberty," from "the use of excessive and unreasonable force," and from the "deprivation without due process of law" of "the right to the enjoyment of life, liberty and property." Claim II is brought by Oscar and Mrs. Fernandez individually for alleged violations of the constitutional rights to the "continued existence of their family and to family integrity," more specifically the right "to the parenting" of Fernandez and "to the marriage relationship" with him. Claim III is

brought by Mrs. Fernandez for alleged violations of her constitutional rights to freedom from "an unwarranted invasion of personal liberty," and from the deprivation of her "right to the enjoyment of life, liberty and property" without due process of law. Claims I through III allege grossly negligent, reckless, and/or wantonly dangerous conduct and excessive use of force by the defendant officers. Claims IV through X allege various common-law and state-law torts. The district court found Leonard to be absolutely immune from Claims IV through X, which alleged only common-law and state-law torts, and plaintiffs have not appealed from that ruling. No appeal has been taken by defendants Town of Brookline and the four Brookline police officers from the district court's denial of their motions for summary judgment.

Leonard challenges the district court's denial of his motion for summary judgment on two principal grounds: (1) that there was no genuine issue of material fact as to whether his conduct violated plaintiffs' constitutional rights and that, therefore, the district court erred in denying his claims of absolute and qualified immunity, and (2) that the constitutional violations alleged were not clearly established at the time of the shooting and that, therefore, the district court erred in denying his claim of qualified immunity.

FACTS

The facts before the district court were in large part the result of discovery. On December 26, 1976, it was reported to the FBI by Ivan Rodriguez (Rodriguez), a member of the Fernandez family, and half-brother to Oscar, that Oscar had been kidnapped and that the kidnappers were demanding $60,000 ransom. The family had made contact with the kidnappers by telephone and they were able to identify the voice of one of the kidnappers as that of a Thomas Oses (Oses). Defendant Leonard took charge of the case for the FBI, contacted the Brookline Police Department, and arranged to install a tape recorder on the telephone of the Fernandez apartment. The Brookline police were already familiar

with both Oses and Rodriguez from other contacts with them.

Sometime in the morning of December 27, the kidnappers entered the Fernandez apartment unexpectedly. Two friends of the family who were in the apartment slipped out the back when the kidnappers entered from the front, and informed the police what had happened. Although the sequence of events is not clear, both the Brookline police and Leonard got word that the kidnappers were in the Fernandez apartment. They also had been told, however, that a Spanish-speaking FBI agent had recently been on the phone with Fernandez and had received no indication that anything was amiss. The police captain in charge, Captain Fleming, and Leonard decided to enter the apartment with a group of plainclothes detectives and uniformed officers. Five police officers and Leonard climbed the stairs to the front door of the apartment and several officers went up to the back door. The police knocked on the front door and then rapped on it with a nightstick. They claim to have shouted that they were police. The members of the Fernandez family state that they did not know who was at the door. After the knock and rapping on the door, the kidnapper Oses, who was armed with a knife, took a position to the right of the door opening into the apartment. The other kidnapper, William Sheppard, who had a pistol, went into the first room to the left of the door. Fernandez went to open the door.

When Fernandez opened the door, he and Rodriguez saw the police, with some of them holding drawn weapons. He and Rodriguez backed up into the foyer. As the police entered the apartment, Oses shouted to Sheppard: "Police" Rodriguez communicated to the police with gestures and words that Sheppard was in the room to their left holding a gun. Captain Fleming moved to the right and disarmed Oses. Mrs. Fernandez says that about this time she was pushed away into a side room by her husband. Sheppard then appeared from the room on the left brandishing the pistol in his right hand and grabbed Fernandez with his left arm.

There are differing accounts of what then happened. Some accounts have Sheppard holding Fernandez around the neck and using Fernandez's body as a shield, one account has Sheppard simply grabbing Fernandez by the shoulder. Some versions of what happened have Sheppard placing the barrel of the gun against Fernandez's head, one against Fernandez's side, and others have Sheppard waving the gun around the room. Some witnesses state that Fernandez and Sheppard began to struggle, another describes it as pushing and jostling each other, sort of "jockeying" for position. Rodriguez claims he moved in to disarm Sheppard and was knocked to the floor from behind by detective McDermott. He then heard the first shot. McDermott claims he grabbed *Sheppard* from behind and pulled him to the floor, dragging him backwards against his chest as a shield, and then heard the first shot. Officer Murphy and agent Leonard saw neither Rodriguez nor McDermott intervene. Murphy claims he went up to the struggling Fernandez and Sheppard, reached around Fernandez who was held in front of Sheppard, put his revolver into Sheppard's stomach, and fired one shot, after which Sheppard dropped to the floor. Neither Rodriguez nor McDermott saw Murphy do this, and although McDermott claims to have had Sheppard pressed tightly up against him he never sensed Sheppard receive the bullet.

Rodriguez and Mrs. Fernandez say that after the first shot was fired (by whom they could not see) Fernandez turned around to Mrs. Fernandez and said in Spanish to her that he had been shot and killed. At that moment there was a hail of gunfire from all sides and Fernandez and Sheppard fell simultaneously. Rodriguez states that he was screaming for the police not to shoot his father. McDermott states that it seemed like everyone was screaming continuously almost from the moment he entered the apartment and he could not understand anything being said.

Fernandez died of five wounds from bullets fired from the guns of law enforce-

ment officers.[1] McDermott was hit in the leg by a bullet from one of those guns, and Sheppard also received a bullet from the same source. It is undisputed that McDermott fired two shots at Fernandez's back, aiming at the upper right shoulder, that Murphy fired one shot at Fernandez, aiming at the front right shoulder, and that Leonard, who was standing to the right of Murphy in the entranceway, fired three times at Fernandez. The police and Leonard claim that they fired at Fernandez in self-defense. They state that Fernandez never turned around to speak to anyone, but that after Sheppard was either tackled or felled by Murphy's bullet, they saw Fernandez holding the pistol, pointing it at Murphy and Leonard, and attempting to fire it. McDermott saw him in a crouched firing position, Murphy and Leonard saw him standing. All three saw him sweeping his arm back and forth, aiming at Murphy and Leonard, and jerking on the pistol as if he were trying to fire it. The two policemen claim to have yelled at him to drop the pistol. Murphy, McDermott and Leonard say they fired in self-defense and to protect each other until Fernandez had fallen and was no longer a threat. The accounts of Rodriguez and Mrs. Fernandez directly contradict Leonard's and the police's version of Fernandez's actions prior to his death. They state that Fernandez never picked up, held or attempted to shoot Sheppard's pistol nor threatened the police in any way. All of those present, police and family members, agree that numerous shots rang out and that there was a hail of bullets. There is no evidence that Fernandez actually fired a shot or that Sheppard's gun was ever discharged.

Under the usual standard governing a summary judgment ruling we must take the plaintiffs' version of the facts as true for purposes of this appeal, resolving all factual disputes and drawing all reasonable inferences in their favor. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Poller v.*

*Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

The facts, as thus assumed, are as follows. The police entered the apartment, guns drawn, after Fernandez opened the door. They saw Sheppard come out, seize Fernandez, and threaten him with a pistol. They also saw Fernandez begin to struggle with Sheppard. Rodriguez moved towards Sheppard to disarm him and he was knocked down from behind by detective McDermott. A shot was fired by one of the police that hit Fernandez, who turned and told his wife that he had been shot and killed. Subsequently the defendant and the police deliberately fired at Fernandez at least five times. It is undisputed that the defendant fired at Fernandez three times. Five law enforcement officers' bullets were found in Fernandez's body. Prior to the police fusillade, the kidnapper Sheppard was holding a gun against Fernandez and threatening his life. At no time did Fernandez have the gun in his hand or threaten the defendant or the police in any way.

Defendant argues that the only difference between his version of the facts and that of plaintiffs is whether or not Fernandez had a gun in his hand. This, he contends, at the most supports a finding that he shot Fernandez in mistaken self-defense, believing that Fernandez had a gun. Under such mistaken belief defendant would, he argues, be liable only for negligence, and there could be no violation of plaintiffs' constitutional rights. If there is no constitutional claim at issue, then, the defendant asserts that he is absolutely immune from suit under *Barr v. Mateo,* 360 U.S. 564, 574–75, 79 S.Ct. 1335, 1341–42, 3 L.Ed.2d 1434 (1959), or that the *Harlow* qualified immunity test, discussed *infra,* is met.

We disagree. Taking the facts in the light most favorable to the plaintiffs, it could be found that defendant did not act in

---

**1.** This is the extent of the bullet-gun identification before us. There is nothing in the record matching bullets with specific guns.

self-defense, mistakenly or otherwise. The facts would admit a finding that for some reason defendant deliberately shot an unarmed man three times. Under the circumstances, this could be found to be grossly negligent, reckless or wanton conduct, which would provide a basis for a finding of constitutional violations. *See* cases *infra.* We agree with the district court that there were genuine issues of material fact that, if resolved in plaintiffs' favor, would give rise to constitutional violations.[2] Defendant thus has no absolute immunity. We now turn to the issue of qualified immunity.

## QUALIFIED IMMUNITY

■ Immunity from suit protects a government official from being subject to the risks and burdens of a trial for actions taken in the course of his official duties. The standard for determining whether a government official has qualified immunity is set out in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). If the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known," then he is not immune from suit. *Id.* at 818, 102 S.Ct. at 2738. The Supreme Court stated:

> If the law was clearly established, the immunity defense ordinarily should fail since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the de-

fense should be sustained. But ... the defense would turn primarily on objective factors.

*Id.* at 818–19, 102 S.Ct. at 2738. The Court also noted:

> Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.

*Id.* at 819, 102 S.Ct. at 2739. The qualified immunity question in this case is whether defendant Leonard should have known he was violating clearly established constitutional rights of the plaintiffs.

### 1. *Due Process*

Plaintiffs allege that defendant Leonard violated the deceased Fernandez's fifth amendment due process rights to life and liberty by grossly negligently, recklessly or wantonly using excessive force that resulted in his death. A substantive due process right to be free of police conduct "brutal" and "offensive to human dignity" was first recognized in *Rochin v. California,* 342 U.S. 165, 174, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952), where the Supreme Court stated that police conduct that "shocks the conscience" violates the Due Process Clause. *Id.* at 172, 72 S.Ct. at 209. Since *Rochin,* there has been a steady stream of cases finding a due process violation when police use excessive force or brutality. This court in 1980 stated:

> We take it as established that, in appropriate circumstances, the use of excessive force or violence by law enforcement

---

**2.** Plaintiffs argue that under *Mitchell v. Forsyth,* — U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and our own case of *Ricci v. Key Bancshares of Maine, Inc.,* 768 F.2d 456 (1st Cir.1985), we may not review these findings of the district court but must confine our review to the purely legal issue of qualified immunity—whether the constitutional violation alleged was clearly established law when it occurred. That may be so. We do not think, for example, that *Mitchell* allows a defendant to bring two interlocutory appeals from his claim of qualified or absolute immunity, first on the pleadings and then on the facts as produced after discovery. We do

not reach the difficult issue of the scope of our review on a *Mitchell* appeal of the district court's denial of summary judgment on the basis that there were genuine issues of material fact because even under the scope of review urged by the defendant—reviewing all findings *de novo* regarding the existence of genuine issues of material fact—the findings of the district court that there were genuine issues of material fact on the question of constitutional violations is amply supported by the facts. This is not a close case on the facts. If it were, the scope of review issue would be pivotal.

personnel violates the victim's constitutional rights.

*Landrigan v. City of Warwick,* 628 F.2d 736, 741–42 (1st Cir.1980). *Accord United States v. Villarin Gerena,* 553 F.2d 723, 724 (1st Cir.1977); *Luce v. Hayden,* 598 F.Supp. 1101, 1104 (D.Me.1984); *Ramos v. Gallo,* 596 F.Supp. 833, 837 (D.Mass.1984); *Schiller v. Strangis,* 540 F.Supp. 605, 613 (D.Mass.1982). We must determine whether such constitutional protection was clearly established in December 1976 when Leonard shot Fernandez. We find that it was.

By December 1976 many courts had found that it was a "clearly established" due process violation for governmental officials to use excessive force against any person. *Harper v. Cserr,* 544 F.2d 1121, 1124 (1st Cir.1976); *Jones v. Marshall,* 528 F.2d 132, 139 (2d Cir.1975); *Clark v. Ziedonis,* 513 F.2d 79, 80 n. 1 (7th Cir.1975); *Gregory v. Thompson,* 500 F.2d 59, 62 (9th Cir.1974); *Curtis v. Everette,* 489 F.2d 516, 518–19 (3d Cir.1973), *cert. denied,* 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); *Johnson v. Glick,* 481 F.2d 1028, 1032–33 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 28 L.Ed.2d 324 (1973); *Rosenberg v. Martin,* 478 F.2d 520, 526 (2d Cir.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973); *Anderson v. Nosser,* 456 F.2d 835, 837–38 (5th Cir.) (en banc), *cert. denied,* 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972); *Collum v. Butler,* 421 F.2d 1257, 1259–60 (7th Cir.1970); *Morgan v. Labiak,* 368 F.2d 338, 340 (10th Cir. 1966); *Stringer v. Dilger,* 313 F.2d 536, 540–41 (10th Cir.1963); *Hardwick v. Hurley,* 289 F.2d 529, 530–31 (7th Cir.1961); *Jackson v. Duke,* 259 F.2d 3,7 (5th Cir. 1958); *Koehler v. United States,* 189 F.2d 711, 712–13 (5th Cir.), *cert. denied,* 342 U.S. 852, 72 S.Ct. 75, 96 L.Ed. 643 (1951); *Phillips v. Ward,* 415 F.Supp. 976, 978 (E.D.Pa.1976), *appeal dismissed,* 575 F.2d 72 (3d Cir.1978); *Reed v. Philadelphia Housing Authority,* 372 F.Supp. 686, 689, 692 (E.D.Pa.1974); *Smith v. Jones,* 379 F.Supp. 201, 203 (M.D.Tenn.1973), *aff'd,* 497 F.2d 924 (6th Cir.1974); *Aldridge v. Mullins,* 377 F.Supp. 850, 857–59 (M.D.Tenn. 1972), *aff'd,* 474 F.2d 1189 (6th Cir.1973).

Only in one circuit, and there only in two cases involving alleged excessive use of force in administering prison discipline, was the existence of the constitutional protection at all in doubt. *Davis v. United States,* 439 F.2d 1118 (8th Cir.1971); *Cole v. Smith,* 344 F.2d 721 (8th Cir.1965); *but see Putnam v. Gerloff,* 639 F.2d 415, 420–21 & n. 6 (8th Cir.1981) (distinguishing *Davis* and *Cole* and acknowledging the majority rule).

■ Although most of the pre-1976 decisions finding a due process right to be free of excessive use of force by government officials did not specify whether the right was "substantive" or "procedural," we think such protection could only be substantive. In *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.1973), Judge Friendly wrote a carefully reasoned opinion explaining that the often unidentified due process right to be free of excessive use of force by government officials derived from *Rochin,* and he reaffirmed that the source of that right was in substantive due process. *Johnson v. Glick,* 481 F.2d at 1030–33. This was echoed in *Jones v. Marshall,* 528 F.2d 132, 139 (2d Cir.1975); *Meredith v. State of Arizona,* 523 F.2d 481, 483–84 (9th Cir. 1975); *United States v. Stokes,* 506 F.2d 771, 775–76 (5th Cir.1975); and *Polite v. Diehl,* 507 F.2d 119, 128 (3rd Cir.1974), all cases decided before 1976.

A significant change in the law has taken place this year. The Supreme Court has held that simple negligence does not violate the Due Process Clause of the Constitution. *Daniels v. Williams,* —— U.S. ——, ——, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* —— U.S. ——, ——, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). In *Daniels* and *Davidson,* however, the Supreme Court expressly distinguished the negligence claims before it in those cases, where there was unintended injury, from cases involving excessive use of deliberate force by government officials. The Court cited *Rochin* and *Johnson v. Glick* as examples of the latter. *See Daniels v. Williams,* —— U.S. at —— – ——, 106 S.Ct. at ——; *Davidson v. Cannon,* —— U.S. at ——, 106 S.Ct. at 670. The Due Process Clause "was designed to prevent" "abusive

government conduct," said the court in *Davidson* at ——, 106 S.Ct. at 670, citing *Daniels* at —— — ——, 106 S.Ct. at 665–66. That is the conduct alleged here.

We think that a substantive due process right to be free of governmental force that amounts to more than negligence and is so excessive and brutal that it "shocks the conscience" was clearly established in 1976. Indeed, the very concept of a violation of substantive due process is that the conduct complained of is impermissible *per se* and is thus necessarily clearly established.

By 1976 there were cases finding a due process violation in situations where the police had intentionally shot someone without justification. *See Clark v. Ziedonis,* 513 F.2d 79, 80–1 (7th Cir.1975) (unjustified firing of shotgun at juveniles, one holding a file thought by the policeman to be a pistol); *Jenkins v. Averett,* 424 F.2d 1228, 1231–32 (4th Cir.1970) (reckless shooting of unarmed man who had halted); *Aldridge v. Mullins,* 377 F.Supp. 850, 857–59 (M.D. Tenn.1972), *aff'd,* 474 F.2d 1189 (6th Cir. 1973) (policeman shot running youth without justification).

■ Applying Judge Friendly's factors to determine if the constitutional line between a common-law action for assault and battery or wrongful death and a constitutional action for "conduct that shocks the conscience" was clearly crossed under the facts before us, we also find that it was. Under *Johnson v. Glick,* 481 F.2d 1028, we

> must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Id.* at 1033. Although there is nothing on the record indicating that Leonard acted maliciously or sadistically in shooting Fernandez, the shooting was intentional. Leonard claims he shot in self-defense and to protect the other officers, but the facts as we must read them indicate that he had

no grounds for such a belief. There was no need for the application of *any* force against Fernandez, who was held at gunpoint by a kidnapper in his home, and did not threaten Leonard or any one else. It could be found that Leonard intentionally used deadly force against Fernandez, firing three times directly at him at point-blank range, and contributed to his death. Gunning down an innocent hostage without reason or provocation is "conduct that shocks the conscience." Thus we find plaintiffs have alleged a cause of action for the raw abuse of police power against Fernandez and that it was a clear constitutional violation of which Leonard, a law enforcement agent of the FBI, should have been aware in 1976.

■ If it has been determined that the defendant violated clearly established law, *Harlow* also allows the defendant to prove that, even though a reasonably competent public official should know the law governing his conduct, there were extraordinary circumstances preventing him from knowing or being capable of knowing the relevant law. Here, too, the defense turns "primarily on objective factors." *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738. Defendant has not adduced such proof. Leonard asserts that his state of mind (believing he was firing in self-defense) and the fact that two other policemen also fired at Fernandez believing they were acting in self-defense or to protect other officers, support a finding that these were "extraordinary circumstances." Defendant's argument misses the point. He is merely rearguing his version of the facts, which is contradicted by the plaintiffs. Proof of "extraordinary circumstances" must amount to a showing that despite the clearly established existence of the legal rights of the plaintiffs something extraordinary prevented the defendant from actually knowing it. *See, e.g., Lowe v. Letsinger,* 772 F.2d 308, 314 (7th Cir.1985).

### 2. *Fourth Amendment*

■ Plaintiffs also claim that defendant Leonard violated the deceased Fernandez's fourth amendment right to be free of un-

reasonable seizures. The Supreme Court in *Tennessee v. Garner,* —— U.S. ——, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), held it to be a violation of the fourth amendment for a police officer to "seize an unarmed, non-dangerous suspect by shooting him dead." *Id.* 105 S.Ct. at 1701. The question before us is whether this constitutional violation was clearly established in December 1976. We think that it was.

> In *Garner* the Supreme Court stated: Whenever an officer restrains the freedom of a person to walk away, he has seized that person. *United States v. Brignoni-Ponce,* 422 U.S. 873, 878 [95 S.Ct. 2574, 2578, 45 L.Ed.2d 607] (1975). While it is not always clear just when minimal police interference becomes a seizure, see *United States v. Mendenhall,* 446 U.S. 544 [100 S.Ct. 1870, 64 L.Ed.2d 497] (1980), *there can be no question* that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.

*Id.* at 1699 (emphasis added). All nine Justices agreed that a law enforcement officer "seizes" someone by shooting him. *Id.* at 1709 (O'Connor, J., dissenting). By 1976, as was reaffirmed and clarified in 1975 in *United States v. Brignoni-Ponce,* the clearly established law was that any *unreasonable* restraint on the freedom of an individual by a police officer was a fourth amendment violation. The Court in *Brignoni-Ponce* explained that

> the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.

*Id.* 422 U.S. at 878, 95 S.Ct. at 2578. In the case before us plaintiffs adduced facts from which it could be found that Leonard used deadly force to seize Fernandez without any justification. This was in 1976 a

patently unreasonable seizure that violated what was well established fourth amendment law at the time.[3] There were cases decided before 1976 holding that the use of excessive force by police to detain a suspect violated the fourth amendment. *See Pritchard v. Perry,* 508 F.2d 423, 425–26 (4th Cir.1975) (illegal arrest even without violence can be constitutional violation); *Jenkins v. Averett,* 424 F.2d 1228, 1231–32 (4th Cir.1970) (grossly negligent use of excessive force during arrest), and cases cited therein.

### 3. Other Constitutional Violations

Plaintiffs' complaint alleges that defendant Leonard violated 42 U.S.C. §§ 1983 and 1988. In their memorandum in response to defendant's motion for summary judgment, plaintiffs argued that federal agent Leonard was "acting under color of state law" because he "conspired with state officials to violate the constitutional rights of Fernandez." The defendant never responded to this argument and the district court did not consider it. On appeal the defendant mentions in a footnote that § 1983 does not apply to a federal officer acting under federal law, but he never refutes plaintiffs' conspiracy theory. Defendant has waived his opportunity to appeal this issue before trial and we do not consider it.

■ In their complaint the plaintiffs also claim violations of the eighth and ninth amendments and deprivations of the rights to the existence of a family, of having a parent, and to being married. Mrs. Fernandez also claims her own personal liberty was invaded and that she was deprived of her life, liberty and property by defendant's actions. But, outside of the allegations in the complaint, plaintiffs have never pressed these claims either before the district court or before us. The plaintiffs have argued and cited cases only on their claims that the fourth and fifth amendments were violated by defendant's exces-

---

**3.** Defendant argues that *Garner* was not decided until 1985 and should have no effect on our consideration of the state of the law in 1976. Insofar as *Garner* decides a novel question of law the defendant is correct. The novel issue in *Garner,* however, was not whether a shooting by

the police was a seizure subject to the reasonableness requirement of the fourth amendment but whether a state statute that authorized the use of deadly force to secure the arrest of nondangerous fleeing felons violated that reasonableness requirement.

sive use of force and that there is no qualified immunity as to those claims. The district court discussed only the due process claim against Leonard and ruled that it would not grant summary judgment as to Claims I through III. Much more was included in those claims, however, than just due process and defendant raised the defense of no constitutional violation and qualified immunity as to each allegation. We, therefore, grant summary judgment for defendant as to all the other constitutional claims because of the plaintiffs' failure to press them either below or before us.

We, therefore, affirm the district court insofar as it denied defendant absolute immunity and qualified immunity as to the alleged due process and fourth amendment violations of Claim I. We intimate no opinion as to the merits of the claims based on 42 U.S.C. §§ 1983 and 1988. We reverse insofar as the district court denied qualified immunity as to the remainder of Claim I, and to Claims II and III.

*Affirmed in part, reversed in part, remanded for trial.*

Costs awarded to plaintiffs.