**David Lee v. City of Portsmouth        CV-00-559-B        03/19/02**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


**David Lee**

   **v.**                                        Civil No. 00-CIV-559-B
                                            Opinion No. 2002 DNH 064
**The City of Portsmouth,**
**Portsmouth Police Department,**
**Portsmouth Police Chief Bradley**
**Russ, Portsmouth Detective Al Kane,**
**Portsmouth Police Officers**
**Michael W. Maloney,**
**Russell J. Russo,**
**and John and Jane Doe,**


**MEMORANDUM AND ORDER**

This is a civil rights damages action brought under 42

U.S.C. § 1983 and a number of supplemental state-law theories.

The gist of plaintiff David Lee's complaint is that the named

defendants invaded rights secured him by the United States

Constitution, the New Hampshire Constitution, and New Hampshire

common law when they used excessive force in arresting him and

then detaining him beyond the point of even arguably having

probable cause to believe that he had committed a crime.  The

pertinent defendants have moved for summary judgment on Lee's

federal claims, contending that (1) they are entitled to

qualified immunity from the excessive force claim; (2) Lee's claims for municipal and supervisory liability are insufficiently supported; and (3) Lee's detention was at all times justified.[1] In his objection to defendants' motion, Lee concedes that he lacks viable federal claims for municipal and supervisory liability, but asserts an entitlement to trial on his federal excessive force and unlawful arrest claims. I agree and deny the motion with respect to those claims.

## I. BACKGROUND

I construe the record in the light most favorable to Lee and draw all reasonable inferences in his favor. See e.g., Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001) (explaining the operation of Fed. R. Civ. P. 56).

On January 13, 2000, at approximately 10:00 p.m, Lee, Mrs. Ester Lauter (Lee's mother) and Mr. Kenneth Lauter (Lee's step-

---

[1]Defendants also assert a derivative argument that their entitlement to summary judgement on Lee's excessive force and unlawful arrest claims concomitantly entitles them to summary judgment on his federal conspiracy claims. Because, as I explain infra, defendants are not entitled to summary judgement on Lee's excessive force and unlawful arrest claims, I reject their conspiracy argument as well.

father) arrived at the Lauters' Portsmouth residence, 1151 Woodbury Avenue, and found Lee's sister, Grace Lee, lying outside with a gunshot wound to her head. Lee gathered his parents and went inside the house to place a 911 call. An operator in Concord took the call and routed it to the Portsmouth Police Department's dispatch center, which in turn informed Detective Al Kane that the police and an ambulance were needed at 1151 Woodbury Avenue for a gunshot victim who was possibly dead.

While the 911 operator was questioning Lee, Kane dispatched a number of the police units to the scene of the shooting. Kane then got on the phone with Lee and asked a number of questions, to which Lee repeatedly responded, "Can we do this when you get here?" and hung up the phone. Kane subsequently advised all responding units that "a male caller was on the phone with me. He stated that he shot his sister."

Because the responding officers[2] were under the false impression that Lee had shot his sister, they arrived at the scene of the shooting poised to apprehend him. Russo noted that

---

[2]Officers Russell Russo, David H. Colby, Christian M. Cummings, Brabazon, Michael Maloney, Richard Webb Jr., and Sgt. Schwartz.

Lee had his left hand in his pocket and a black cylinder shaped object in his right hand that Russo believed to be a Mag style flashlight. Russo drew his weapon, pointed it at Lee, and instructed Lee to lie face-first on the ground and to show both hands. Lee made both hands visible, but did not comply with Russo's demand that he lie down on the ground.

According to Lee, the apprehending officers, Maloney and Russo, then kicked him in the leg, threw him to the ground, hit him on the back of the head, and handcuffed him behind his back. Lee repeatedly asked Officers Maloney and Russo to help his sister, but was told to "shut up." Lee complained that the handcuffs were too tight and that his wrists and elbows were injured. Again the officers told him to "shut up." Lee stated that he "had nothing to do with her [Grace Lee] being shot," but without effect. The officers told Lee to be quiet, he failed to comply, and in Lee's words: "I was turned on my back, held by the throat and choked by one of the officers. While he was choking me he repeatedly told me to 'shut up.' I almost passed out and could not catch my breath."

Maloney searched Lee while he was on the ground and found nothing on his person. Maloney then went to get his cruiser

while Colby retained custody of Lee. Colby states without contradiction that, as Maloney walked to the cruiser, Lee got up to his feet with his back toward Colby. Colby told him to lie back down and when Lee did not comply Colby forced Lee to the ground. Colby and Maloney then threw Lee in the cruiser and Maloney transported him to the police station. At the police station, Lee continued to maintain his innocence and to ask about his sister. Lee told the officers that his elbow and neck hurt and asked them to front-cuff him. Eventually, the officers did so.

While the officers were arresting Lee, emergency personnel found a gun beneath the victim. Russo secured the weapon, and Swartz, Webb, and Cummings secured the inside of the house. Inside the house, Kenneth Lauter told Cummings that he did not know what had happened, but that he did know that David had found Grace outside. Colby took the Lauter's to the hospital where Grace Lee had been rushed. There they learned that she had been pronounced dead.

Meanwhile, just after the 911 call came in, Det. Sgt. Michael Ronchi was notified of the incident and reported to Portsmouth Police Headquarters. There he met with Cpt. Price and

Deputy Chief Magnant and reviewed the tape of the call. After doing so, Ronchi immediately notified Price and Magnant that "David Lee . . . never made the statement that he shot his sister." At this time, Ronchi also learned that a firearm was recovered under the body of the deceased. Ronchi and Price then drove to the scene of the shooting, arriving at 11:05 p.m.

After arriving at the shooting scene, Ronchi and Prince spoke with Russo and Schwartz and examined the handgun found under Grace Lee and the blood pattern in the driveway. Ronchi and Price then went to the Portsmouth Hospital, viewed the victim and her injuries, and concluded, in Ronchi's words, that Grace Lee "had taken her own life by shooting herself in the right side of her head with a 9mm Ruger handgun." Thereafter, Ronchi and Price left the hospital and returned to police headquarters.

At 11:46 p.m., Ronchi began taking a taped statement from Lee. Lee began the interview by saying his throat hurt and that one of the officers had choked him "really, really hard." Immediately thereafter, Ronchi told Lee that he could stop the interview and get up and walk out at any time. He also told Lee

that he was not under arrest.[3]

Lt. Robert Carbone interviewed Kenneth Lauter at the hospital.  In his affidavit, Lauter states that "the interview did not end until close to 2:00 a.m.[4] [and] David was not brought to us at the hospital until over an hour later, at approximately 3:15 a.m."  Lauter also avers that Lee was injured when he arrived: "David had blood all over his head, dripping down his neck and right side, had black and blue bruises on his neck, a swollen jaw, and complained of pain to his elbow."

According to Officer Colby, when Ester Lauter saw Lee, she asked him why her son had been beaten up.  Colby explained that Kane had sent the responding officers to the scene of a homicide, not a suicide, and that the officers needed to handcuff and secure David until they knew what happened "because we still didn't know where the gun was."  According to Colby, Lee told his

---

[3]Lee says in his affidavit that he was not "released" until well after two the next morning, but does not explain why Ronchi's statement that Lee was free to leave did not terminate the arrest.  Accordingly, for the purposes of ruling on defendants' summary judgement motion, I shall regard Lee's detention as ending just prior to midnight.

[4]According to the transcript, the interview ended at 1:46 a.m.

mother that he had been punched several times in the face, kicked repeatedly while he was on the ground, and choked until he passed out.  Colby advised Carbone about this conversation.

Ultimately, the medical examiner's office determined that Grace Lee's death was a suicide.


## II.  STANDARD OF REVIEW

Summary judgment is appropriate if the record, viewed in the light most favorable to the non-moving party, shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94-95 (1st Cir. 1996).  A genuine issue is one that "properly can be resolved only by a finder of fact because [it] . . . may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A material fact is one "that might affect the outcome of the suit."  Id. at 248.

In ruling on a motion for summary judgement, "the court must construe the evidence in the light most favorable to the non-movant."  Navarro, 261 F.3d at 94.  The party moving for summary

judgment, however, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena, 95 F.3d at 94 (citing Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 249).

## III.  DISCUSSION

### A.  Excessive Force

As noted above, Lee alleges that defendants Maloney, Russo, and John and Jane Doe used unconstitutionally excessive force when they apprehended him.  These defendants have moved for summary judgement on this claim, arguing that, as a matter of law, they are entitled to qualified immunity.  In pressing this point, defendants contend that their actions were objectively

reasonable given their belief that Lee had shot his sister.  I disagree.

The Supreme Court recently elaborated the process for resolving whether an officer is entitled to qualified immunity from an accusation of excessive force.  The Court cautioned that reviewing courts must avoid fusing the qualified immunity analysis with the question of whether unreasonable force was used in making the arrest, and instead undertake a two-part inquiry. See Saucier v. Katz, 121 S. Ct. 2151 (2001).  Courts must consider whether the facts, "taken in the light most favorable to the party asserting the injury . . . show [that] the officer's conduct violated a constitutional right."  Id. at 2156.  If a violation could be made out on a favorable view of the plaintiff's submissions, the second "sequential step is to ask whether the right was clearly established."  Id.  "Clearly established for the purposes of qualified immunity means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Wilson v. Lane,  526 U.S. 603, 614-15 (1999)(quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)).

If the law would not have put an objectively reasonable officer on notice that his conduct was unlawful, summary judgment based on qualified immunity is appropriate. See Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law.").

The Fourth Amendment protects against the use of excessive force by police officers in carrying out an arrest. Graham v. Connor, 490 U.S. 386, 394-95 (1989); Gaudrealt v. Salem, 923 F.2d 203, 205 (1st Cir. 1990). In the case of a non-resisting, compliant suspect, this freedom is unquestionably an "established right." Comfort v. Town of Pittsfield, 924 F.Supp. 1219, 1228 (D.Me. 1996) (citing Fernandez v. Leonard, 784 F.2d 1209, 1217 (1st Cir. 1986). There is admissible evidence that while Lee, handcuffed and restrained face first on the ground, shouted "help my sister," the officers turned him on his back, held him by the throat, and choked him. In addition, there is admissible evidence that, hours after the attack, Lee had blood all over his head, black and blue bruises on his neck, and a swollen jaw. This evidence, if credited by the jury, could ground a reasonable finding that defendants invaded Lee's right to be free from

excessive force during his arrest. Accordingly, the defendants cannot prevail on the first part of the qualified immunity analysis.

The next step is to ask whether the right to be free from excessive force under the facts alleged was clearly established. As set forth above, the defendants argue that they are entitled to qualified immunity because, based on their then-reasonable belief that Lee had shot his sister, their actions were not clearly unreasonable under settled law. But, the right of a person in custody to be free from assault on his person after being handcuffed and subdued is "clearly established." See Fernandez v. Leonard, 784 F.2d 1209, 1214-15 (1st Cir. 1980)(holding that the right to be free from the use of excessive force has been well established since 1976); see also Bartram v. Wolfe, 152 F.Supp. 2d 898, 908 (S.D.W.Va. 2001) (An unprovoked battering of a hand-cuffed arrestee who poses no immediate threat to the officers safety is objectively unreasonable). Defendants Russo, Maloney, and John and Jane Doe are not entitled to qualified immunity from Lee's excessive force claim.

## B. **Unlawful Detention**

Lee also alleges that defendants Maloney, Russo, and John and Jane Doe invaded his right to be free from unlawful arrest by continuing to detain him beyond the point where they even arguably had probable cause to believe that he had committed a crime. Defendants have moved for summary judgement on this claim as well, arguing that, as a matter of law, Lee's detention while the circumstances of Grace Lee's death were being investigated did not amount to a constitutional violation.

"The Fourth Amendment right to be free from unreasonable seizures of the person demands that an arrest be supported by probable cause." Santiago v. Fenton, 891 F.2d 373, 383 (1st Cir. 1989)(citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). Probable cause to arrest "exists when the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992) (alterations in original) (citations omitted). Following a legal warrantless arrest based on probable cause, an

affirmative duty to release arises if the arresting officer ascertains beyond a reasonable doubt that the suspicion (probable cause) which forms the basis for the privilege to arrest is unfounded. Thompson v. Olson, 798 F.2d 552, 556 (1st Cir. 1986) (citing Restatement (Second) of Torts § 134, Comment f.); see also Babers v. City of Tallassee, Ala., 152 F.Supp.2d 1298, 1309 (5th Cir. 2001).

As stated above, Ronchi learned that Kane had misconstrued Lee's 911 call at some point prior to 11:05 p.m. on the night of the shooting. Thus, even if I assume arguendo that Kane's misinterpretation of Lee's statements during the call initially shielded the arresting officers from unlawful arrest liability, any probable cause resulting from the misunderstanding, which formed the basis for the arrest, evaporated when Ronchi learned that a mistake had been made. Nonetheless, after learning of Kane's error, Ronchi did not see to it that Lee was immediately released. Instead, he and a fellow officer went first to the crime scene and then to the hospital to conduct further investigation. Under this set of facts, a jury reasonably could conclude that Lee's detention beyond the point where Ronchi

-14-

discovered Kane's error was unlawful. Accordingly, I deny the defendants' motion for summary judgement on Count II.

## C. Municipal and Supervisory Claims

Because Lee concedes that his claims for municipal and supervisory liability are insufficiently supported, I grant defendants' motion for summary judgment [document no. 11] with respect to Lee's federal claims against defendants City of Portsmouth, Portsmouth Police Department, Chief Bradley Russ, and Detective Albert Kane.

## IV. CONCLUSION

For the foregoing reasons, I deny the defendants' motion for summary judgment (document no. 11) on Count I, excessive force; Count II, unlawful detention; and Count III, conspiracy.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

March 19, 2002
cc:  Lawrence Vogelman, Esq.
     William G. Scott, Esq.