**GARY H., et al., Plaintiffs-Appellees,**

v.

**Leo HEGSTROM, J.N. Peet, Richard S. Peterson, Bennett K. Holt, Jr., Leonard Munks, Dale Reeves, Joseph H. Trealeaven, M.D., Verne A. Duncan, and Jesse Fasold, Defendants-Appellants.**

**No. 85–3730.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 9, 1986.

Decided Nov. 4, 1987.

Loren M. Warboys and Robert Walker, San Francisco, Cal., Michael H. Marcus and Julie McFarland, Portland, Or., for plaintiffs-appellees.

Michael D. Reynolds, Salem, Or., for defendants-appellants.

Before GOODWIN, WALLACE and FERGUSON, Circuit Judges.

GOODWIN, Circuit Judge:

Ten years ago, after complaints about the management of Oregon's MacLaren facility for adolescent wards of the juvenile court failed to bring about desired reforms, eleven inmates filed a class action. Seven years later, after numerous attempts to settle the case, the district court entered a decree enjoining, on federal constitutional grounds, some eighteen pages of instructions for managing the institution. The state appeals.

The case has not become moot even though the original plaintiffs have become adults. New inmates have taken their places. Counsel for both sides assure us that the controversy is an on-going one despite evolving improvement in institutional budgets and management during the past decade. It became clear at the oral argument that the state was and remains willing to make adjustments in the treatment of internal disciplinary problems, but the state is not willing to yield entirely to the micromanagement by the court encompassed in the challenged decree.

The trial court's findings of fact are not clearly erroneous. Lengthy and detailed findings reveal that the housing of juvenile wards in Oregon was and is not perfect. Children have been placed in disciplinary segregation for periods exceeding 24 hours without a hearing. Light, ventilation and cleanliness could be improved. Professional experts testified at length about better ways of dealing with assorted problems. The trial court correctly found that many of the institutional practices were substandard, not only according to the latest thinking of the behavioral scientists and other interested professionals who testified, but in due process terms.

The Supreme Court has not announced the appropriate federal standards by which to judge state juvenile detention facility conditions. *See e.g., Ingraham v. Wright,* 430 U.S. 651, 669 n. 37, 97 S.Ct. 1401, 1411 n. 37, 51 L.Ed.2d 711 (1977) (expressly reserving the question whether the cruel and unusual punishments clause applies to juvenile institutions). Lower federal courts differ on the appropriate standard: Some apply the eighth amendment. *E.g., Nelson v. Heyne,* 491 F.2d 352, 355 (7th Cir.) (applying eighth amendment to guards' beatings of juveniles confined at medium security boys school), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). Other courts apply the due process clause. *E.g., H.C. by Hewett v. Jarrard,* 786 F.2d 1080, 1084–85 (11th Cir.1986) (applying due process clause to conditions of confinement of a juvenile confined pending trial on delinquency charges); *Santana v. Collazo (Santana I),* 714 F.2d 1172, 1179 (1st Cir. 1983) (using eighth amendment standards as constitutional minimum, but applying due process clause to juveniles confined for status and minor offenses), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984); *Milonas v. Williams,* 691 F.2d 931, 942 & n. 10 (10th Cir.1982) (applying due

process clause to conditions involving juveniles confined for discipline problems and crimes), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983).

■ From our review of the case law and the statutes governing MacLaren, we conclude that the approach employed by the *Santana I* court—applying the due process clause, which implicitly incorporates the cruel and unusual punishments clause standards as a constitutional minimum—is the appropriate standard for reviewing conditions at MacLaren.

■ The status of the detainees determines the appropriate standard for evaluating conditions of confinement. The eighth amendment applies to "convicted prisoners." *See Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir.1986); *see also Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) ("the Cruel and Unusual Punishments Clause was 'designed to protect those convicted of crimes' ") (quoting *Ingraham v. Wright*, 430 U.S. 651, 664, 97 S.Ct. 1401, 1408, 51 L.Ed.2d 711 (1977)). By contrast, the more protective fourteenth amendment standard applies to conditions of confinement when detainees, whether or not juveniles, have not been convicted. *See e.g., Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (involuntarily committed mental patients); *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979) (adult pretrial detainees); *Ingraham v. Wright, supra* (students disciplined at school).

The district court correctly concluded that the Oregon juvenile justice system is noncriminal and nonpenal. The Oregon statutes specifically provide: "The chief objects of the school are educational and reformatory, rather than penal, but this does not prevent the confinement and discipline of juvenile offenders therein." Or.Rev. Stat. § 420.120(3) (1985). Thus, we hold that the district court correctly concluded that the fourteenth amendment applies to conditions of confinement at MacLaren.

The trial court next sought the help of counsel to negotiate an agreed form of order. After several efforts at negotiation, and after agreement on many points, complete accord broke down because the plaintiffs wanted too much and the state was willing to do too little. The district court finally adopted as a remedial order virtually the entire wish list of the plaintiffs.

The court appeared to be of the opinion that any treatment falling short of standards adopted by various professional associations was suspect, and probably violated the United States Constitution. A state court construing state law could, no doubt, involve itself in the kind of detailed oversight and management of the institution demonstrated in this case. But nothing we can find in the due process clause of the fourteenth amendment or in Supreme Court decisions authorizes a federal district judge to establish the candle power at desk level of reading lamps, proscribe pink pajamas, or order the superintendent of the institution to maintain seasonal temperatures appropriate for resort hotels. (*E.g.* winter daytime at 65 degrees or above, and 60 at night, summer temperatures not to exceed 80 degrees.) The Constitution requires only minimally adequate training, and reasonable balance between liberty interests and the institution's operational needs. *See Youngberg*, 457 U.S. at 322–23, 102 S.Ct. at 2461–62.

In general, we review the scope of an injunction for an abuse of discretion. *Hoptowit v. Ray*, 682 F.2d 1237, 1245–46 (9th Cir.1982). "Injunctive relief against a state agency or official must be no broader than necessary to remedy the constitutional violation." *Toussaint v. McCarthy*, 801 F.2d 1080, 1086 (9th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). Thus,

> [w]e will scrutinize the injunction closely to make sure that the remedy protects the plaintiffs' constitutional rights and does not require more of state officials than is necessary to assure their compliance with the constitution. Within these parameters, we will defer to the district court.

*Id.* at 1089.

■ In this case, we believe that the distinguished trial judge went well beyond

the oversight of the management of the institution necessary to protect the due process rights of inmates. To the extent that the court ordered due process hearings prior to confinement in excess of 24 hours, and minimum sanitary, health, educational and medical resources for the inmates, the decree was clearly within the power of a federal court to assure minimum constitutional standards taught by *Youngberg*. But the wholesale adoption of various professional associations' concepts for model institutions as if they were constitutionally mandated was unwarranted. *Hoptowit v. Ray*, 682 F.2d at 1253. There we held that it was error for the court to constitutionalize the standards of the American Medical Association and the American Public Health Association.

On remand, the trial court should invite the state to submit a report of the remedial actions it has taken to date, with or without the compulsion of the challenged order, and to designate which remedial actions it will take in the future. The court should then require briefs and arguments that focus on the *Youngberg* due process concerns. *Hoptowit*, 682 F.2d at 1247 (citations omitted), is instructive on this point:

> ... only the specific conditions that violate the Constitution may be remedied, and the remedy may be only so much as is required to correct the specific violation. A remedy may go beyond this only when there is a record of past constitutional violations and violations of past court orders.

In ordering a remedy, courts must consider the cost of compliance and the effect on legitimate security needs. Courts should consider bona fide steps that prison officials are taking to alleviate poor prison conditions. This is not to say that such steps necessarily obviate the need for a remedy. Rather, the court should defer to the policy choices made by prison officials and order a remedy consistent with the basic approach taken by prison officials, unless that approach itself is inconsistent with the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. at 562, 99 S.Ct. at 1886.

While it is true that there are "obvious differences between adult penal institutions and juvenile training schools," those differences should be accounted for in the liability stage, not the remedy stage. Once a constitutional violation is found, the remedy should be no broader than is required to meet the particular constitutional standard applied in establishing liability. It is not the duty of the district judge to fashion operating manuals for state institutions. It is, however, the duty of the federal courts to make certain that minimal constitutional rights are preserved. The order entered in the trial court in this case far exceeds anything remotely required by the fourteenth amendment.

Vacated and remanded with neither party to recover costs. If further appeals are necessary, this panel will retain the case.

FERGUSON, Circuit Judge, concurring in the result:

I concur in the result that the majority reaches. I write separately as I cannot join the majority's conclusion that the district judge abused his discretion in issuing the detailed remedial order. The defendants failed to raise any objections to the scope of the order in the district court, and present no convincing reason why we should now review the order despite their failure to preserve the issue for appeal. However, because of potential difficulties of oversight and enforceability, I believe this court should use its general supervisory powers to vacate the district court's detailed remedial order and remand for further proceedings. Second, I believe that the majority, while expressly upholding the district court's findings of fact, fails to detail the serious constitutional violations which it concedes exist at MacLaren and which alone can explain the district judge's resort to such a detailed order.

## I.

The plaintiffs alleged that the conditions in MacLaren's separate isolation unit (D-1) violated their constitutional rights. The district court made findings of fact with respect to each allegedly unconstitutional

condition. This court may not disturb those findings unless they are clearly erroneous. *LaDuke v. Nelson*, 762 F.2d 1318, 1321 (9th Cir.1985), *amended on other grounds*, 796 F.2d 309 (9th Cir.1986). I agree with the majority that the findings of fact are not clearly erroneous, and summarize them here in order to place this case and the relief ordered in its proper factual context.

## Use and Length of D–1 Confinement

D–1 commitment is a "serious deprivation of liberty," one that also "increases the length of time a student will be required to spend at MacLaren." *Gary H. v. Hegstrom*, No. 77–1039–BU, slip op. at 18–19 (D.Or. Dec. 17, 1984) ("Opinion"). MacLaren regulations provide that officials may confine juveniles from the general population at MacLaren to D–1 isolation only if the juveniles have violated the school's Incident Code or if their conduct poses an imminent threat to themselves or others. *Id.* at 11. Moreover, the regulations require that, before placing a student in D–1, the administrator must consider whether "less restrictive consequences would be appropriate in light of the student's conduct and his rehabilitative program." *Id.* at 13.

The district court concluded that defendants made "[e]xtraordinarily high use" of isolation; indeed, half of all students were placed in isolation at some point during a given month. *Id.* at 11. Moreover, the court found that students were sent to D–1 for conduct that did not require isolation: " 'mouthing off' to staff, refusing to obey an order or directive, yelling or swearing, [and] getting out of bed at nights without permission—behavior generally considered typical for adolescents." *Id.* at 13. The district court accepted the opinion of plaintiffs' expert that "students are assigned to D–1 for punishment," *id.* at 12, rather than for dangerousness, as required by the regulations.

Juveniles are placed in D–1 for indefinite periods of time, sometimes several days or weeks. The district court concluded, from testimony of MacLaren students and experts, that "[t]he impact on students at MacLaren of repeated, long-term confinement to D–1 has been devastating." The court found that such use of D–1 makes students angry, depressed, frightened, self-destructive, and violent. The district court agreed with plaintiffs' experts "that a student should be confined to a unit such as D–1 only so long as necessary to calm him down, and that [only] in the most extreme circumstances should it be necessary or permissible for a child to be confined to D–1 longer than twenty-four hours." *Id.* at 15.

## Procedural Safeguards [1]

The district court found that, although the juveniles' liberty interests are significantly impaired by confinement in D–1 and the Constitution therefore imposes due process requirements, "procedural safeguards are woefully lacking." The court concluded that the defendants have no system "to assure promptly that a D–1 referral is fair and correct.... [S]tudents are not provided with a meaningful opportunity to be heard prior to their confinement." *Id.* at 20. Moreover, the Detention Committee, which decides only whether to continue the confinement once a student has already been placed in D–1, insufficiently protects the students' constitutional rights. Students are confined for indefinite periods, and the staff has unfettered discretion to determine their release.

## Environment in D–1

The district court concluded, from its observation of the conditions during two visits to MacLaren and from testimony at the hearing, that the isolation cells are "dirty and unsanitary": The cells are infested with insects and body lice; the walls are covered with food, spit, blood, toilet paper, and feces; and the rooms smell of urine. *Id.* at 23. Lighting is inadequate; rooms are "dark and depressing." Heating and ventilation systems are inadequate; cell temperatures become uncomfortably hot or

---

1. Defendants apparently agree with the district court's legal conclusions regarding this issue.

*See* Appellant's Opening Brief at 23 n. 6.

cold. Moreover, the staff often block door windows, cutting off ventilation to the cells.

Mattresses and blankets are in poor condition and contain urine from previous residents; requests for additional blankets are frequently denied. Personal hygiene supplies are inadequate; clothing is frequently in ill repair, ill fitting, and inappropriate.

*Discipline*

The district court found certain disciplinary practices in D–1 to be inhumane, degrading, and "punitive." For example, the staff frequently "white tag" students—that is, they remove mattresses, bedding, clothing, reading material, and toilets from the cell, and block the door window—for disciplinary reasons. For the first twenty-four hours in D–1, students are "red tagged"—they may not leave their cells, even for meals or exercise. The court concluded that "there is no legitimate state interest in safety, security or internal control to outweigh the individual interests being violated by these practices." *Id.* at 27.

In addition, the district court found that defendants use physical restraints more often than is necessary and as a substitute for adequate psychiatric care. Despite explicit provisions in the MacLaren rules limiting the use of restraints, students are placed in restraints for "refusing to quiet down, singing, and making noise." *Id.* at 28. Moreover, mental health professionals do not participate in restraint decisions or inspect the children before, during, or after the use of restraints. Staff members receive no training in applying restraints and sometimes injure students when placing them in restraints. The court concluded that "[b]eing in restraints is a very dehumanizing, demoralizing, depressing experience, and the longer it goes on, the more frustrated and provoked the individual feels," and that "[d]efendants fail both in not adequately training custodial staff in the use of restraints and in not requiring prior approval or, where necessary, supervision after the fact by a qualified professional." *Id.* at 29.

*Exercise*

The district court found that the defendants fail to provide adequate opportunities for exercise and recreation, especially large muscle outdoor exercise. Students are denied any recreation for the first twenty-four hours of D–1 confinement and while the students are white tagged. Other students in D–1 are permitted exercise only fifteen to twenty minutes a day; however, defendants often refuse to allow even this limited time. Consequently, juveniles are seldom out of their cells.

The court found that this denial of an adequate recreation program "has a seriously debilitating impact on the D–1 students." *Id.* at 30. It also concluded that exercise is necessary to relieve the students' tension, anxiety, and anger. Defendants offered no reason for these limitations, and the court concluded that the denial of exercise was irrational because the D–1 compound contained a gymnasium and other recreation facilities.

*Education*

D–1 students are denied access to any education program. Students have only minimal access to a sparse collection of books, and students are not allowed any writing materials in their cells. The court concluded that the "[s]tudents are harmed by both the deprivation of an education and educational materials in D–1, and by the resulting forced idleness and frustration." *Id.* at 32. Moreover, it found that the state offered no legitimate justification for denying education.

*Food*

The district court found that students in D–1 are not provided with the same quality of food as other MacLaren residents; the food is unappetizing, cold, and sometimes full of foreign objects. Moreover, children sometimes go hungry; they are not permitted second helpings, and snacks are not routinely provided. Thus, the district court found that the defendants denied the juveniles their basic right to an adequate and nutritious diet, and violated Or.Admin.R. 412–40–110, § 40(b)(3)(b)(1) ("[E]ach [D–1] resident shall receive food of the same quality and quantity, from the same menu

and as nearly as possible on the same schedule, as that provided to all other students.").

*Visitation*

Visitation for those students in D–1 is limited to thirty minutes on Sunday afternoons. The district court found that this restrictive policy "ultimately works to discourage family involvement in a child's rehabilitative program." The court concluded that parental visitation is an "integral part of a child's right to treatment." Opinion at 33.

In addition, the defendants presented no "reasonable justification or legitimate reason for their overly restrictive visitation policy." *Id.* at 34. It found no time or space problems to justify the overly restrictive practice. Moreover, the fact that non–D–1 students are routinely permitted visits and even off-campus privileges belies any assertion that the policy promotes security interests.

*Medical Care*

The district court found many facets of medical care in D–1 to be inadequate: health evaluation and sick call; drug and alcohol dependency;[2] medication; mental illness; and staff and training.

First, the court found a failure to evaluate students' health as they are admitted to D–1; the lack of a sick call system that ensures that each D–1 student with a health problem is identified and provided with needed care; and a failure to respond appropriately to the known health problems of students in D–1. Even when students specifically request medical attention, the staff sometimes ignores them.

Second, the district court found that untrained staff members administer psychotropic, stimulant, and tranquilizing medication on some students. There is no adequate system for evaluating the students and no physician available for medical emergencies. The court found it vital to have prompt initial evaluation and periodic evaluation for adverse effects of psychotropic, stimulant, and tranquilizing medi-

cation. It concluded that the lack of such evaluations threatens the health of the juveniles. The "almost non-existent monitoring system harmed the students by exposing them to undetected side effects and impeded assessment of the effectiveness of the type of dose of the medication given." *Id.* at 36–37.

Third, the court concluded that, despite the high number of D–1 residents who "are both severely mentally disordered and engage in suicidal, self-destructive, or self-mutilating behavior," defendants provide little or no mental health treatment. *Id.* at 37. The court found many examples of students who engaged in self-mutilation, and who did not later receive mental health care. From the experts' testimony, the court concluded that D–1 is an inappropriate place for children with suicidal or self-destructive tendencies. "Since sufficient mental health professional staff is not available at MacLaren, D–1 is used inappropriately to 'punish' those severely disturbed youngsters. Defendants are, in effect, using a lock-up instead of providing treatment." *Id.* at 38.

In addition, the district court found that mental health resources throughout MacLaren were inadequate; as a result, students in D–1 "have no chance of receiving meaningful mental health treatment." *Id.* One psychiatrist works in MacLaren or D–1 three hours a week; one psychologist works twelve hours a week; another psychiatrist works four hours once every two weeks. Thus, counseling of students, superficial at best, is performed almost exclusively by untrained, non-mental-health professionals. This situation produces long delays in obtaining any treatment. One student who had intentionally cut himself had to wait for a month to see a psychiatrist.

Basing its conclusion on its evaluation of the expert testimony, national guidelines, Oregon's administrative procedures, and MacLaren's own regulations, the court ruled that the inadequacy of each of these

---

**2.** Despite the court's finding that the defendants had not provided any drug and alcohol treat-

ment programs, the order fashioned by the parties contains no mention of such programs.

medical conditions violated the juveniles' constitutional rights.

## II.

I agree with the majority that where, as here, an institution is noncriminal and nonpenal, allegations of unconstitutional conditions of confinement are governed by the more protective standard of the Fourteenth Amendment, rather than the Eighth Amendment.[3] I also concur in the majority's conclusion that the district court's findings of fact are sufficient to establish a violation of the Fourteenth Amendment.

In cases in which the state has expressed an intent not to punish, a determination that a practice constitutes punishment, and thus violates the Due Process Clause, "generally will turn on 'whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.'" *Bell v. Wolfish*, 441 U.S. 520, 538, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979). "In assessing whether the conditions are reasonably related to the assigned purposes, we must, further, inquire as to whether these conditions 'cause (inmates) to endure (such) genuine privations and hardships over an extended period of time,' that the adverse conditions become excessive in relation to the purposes assigned for them." *Union County Jail Inmates v. Di Buono*, 713 F.2d 984, 992 (3d Cir.1983) (finding temporary overcrowding in jail facility not punishment) (quoting *Bell*, 441 U.S. at 542, 99 S.Ct. at 1876), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984). Thus, a court examines the government's interest in maintaining the condition, and determines whether the condition is reasonably related to the interest. *See Hamm v. DeKalb*, 774 F.2d 1567, 1573

(11th Cir.1985) ("failure to provide [minimal level] of necessities violates due process— even though the conditions imposed serve some ordinarily legitimate state objective"), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986).

Defendants argue that the district court erred in applying these standards by (1) balancing the juveniles' liberty rights against the state's interest, thus failing to give "proper deference" to the state officials' professional judgment, and (2) improperly relying on the plaintiffs' experts in making its conclusions. Defendants contend that the district court's task is to "defer to professional judgment." These arguments misconstrue both the district court's role generally, and how the district court in this case correctly fulfilled its role.

Under a due process analysis, a state interest is insufficient to justify the imposition of certain conditions or regulations when a protected liberty interest exists if the "officials' belief as to the need for the regulation is unreasonable, or [if] the officials have exaggerated their response to an otherwise legitimate penological objective." *Hill v. Blackwell*, 774 F.2d 338, 343 (8th Cir.1985). A district court has a constitutional obligation to conduct this inquiry. The defendants' suggestion that the courts "defer to professional judgment" negates this essential duty.

In determining whether a response is excessive, a court must weigh the infringement resulting from the response on the individual's liberty against the state's interest. The greater the infringement, the greater the state's interest must be to uphold the infringement. *See, e.g., Hutto v. Finney*, 437 U.S. 678, 686, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978) (courts must consider duration of confinement in decid-

**3.** The distinction between the two constitutional protections would not affect my conclusions in this case. With a few exceptions, application of either Eighth Amendment requirements or higher Due Process Clause requirements supports the district court's conclusions. Even if the Eighth Amendment applies, the level of care required here must account for the fact that those housed in MacLaren are juveniles. The "evolving standards of decency" against which

courts evaluate the constitutionality of the conditions certainly provide greater protection for juveniles than for adults. *See Santana I*, 714 F.2d at 1179 ("It would not be unreasonable to assume that society's conscience might be shocked by the conditions of confinement imposed on a juvenile in an isolation cell, when it would be unwilling to label the same treatment, given to an adult, cruel and unusual.").

ing whether conditions meet constitutional standards); *cf. Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir.1982) (*Hoptowit I*) (Eighth Amendment requires balancing, and therefore permits greater restrictions on inmates' rights during prison emergency). This weighing process properly rests with the prison officials, *see Block v. Rutherford*, 468 U.S. 576, 589, 104 S.Ct. 3227, 3234, 82 L.Ed.2d 438 (1984), and a court may not substitute its views for prison officials' "sound discretion," *id.; see also id.* (district court's *"further* balancing resulted in an impermissible substitution of its views on the proper administration of Central Jail for that of the experienced administrators of that facility") (emphasis added).

However, a court undergoes a similar process to determine whether the officials in fact made a reasonable and sound decision. *See Hill*, 774 F.2d at 342 ("[T]he district court must necessarily balance the need for the particular regulation against the invasion of religious freedom that the restriction entails."); *Milonas*, 691 F.2d at 942 (Due process requires a "balancing process to determine whether the challenged disciplinary practices were so onerous as to overcome the legitimate administrative and security interests of the school.").

Defendants contend that the district court erred by balancing the intrusion on the juveniles' rights against the state's interests when it limited the use of D–1 to those situations in which " 'less restrictive measures' were unavailable." Yet, the district court derived its standard from the state's own administrative rules governing MacLaren. Or.Admin. (Children's Services Division) [hereafter "Or.Admin."] R. 412–40–110, § 40(A)(2)(a) ("Detention Committee must consider whether alternative consequences would be more appropriate in light of the student's conduct and his rehabilitation program."). To the extent that professional judgment deserves deference, the formulation found in the regulation limiting use of D–1 represents that professional judgment. That the MacLaren staff ig-

nored its own regulations represents a sufficiently "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982).

In sum, the district court "balanced" the intrusion of each condition at MacLaren against the state interest only as necessary to determine whether the defendants actually exercised professional judgment. *See Santana v. Collazo (Santana II )*, 793 F.2d 41, 45 (1st Cir.1986) (*Youngberg* establishes "that if the need for restraints, in this case the need for extended isolation, can be *significantly* reduced or eliminated by other equally effective but less confining methods requiring relatively minimal additional effort, it is unreasonable not to use them") (emphasis in original); *Grummett v. Rushen*, 779 F.2d 491, 494 (9th Cir.1985) ("We are satisfied that ... the prison authorities have devised the *least intrusive means* to serve the state's interest in prison security.") (emphasis added); *Wells v. Franzen*, 777 F.2d 1258, 1261–62 (7th Cir. 1985) ("[I]t is the duty of a court to ensure that professional judgment in fact was exercised."). These decisions recognize that such balancing is essential. Only when the court begins to substitute its own judgment for that of the officials does it ignore its responsibility under the Due Process Clause. The district court did not substitute its judgment because it found that no legitimate state interest justified the conditions.[4]

Nor did the district court err in considering the testimony of experts in determining whether conditions at MacLaren violated due process. A court must use objective standards in concluding that a practice violates the Constitution. The Supreme Court has cautioned that " 'Eighth Amendment judgments should neither be nor appear to be merely the subjective views' of judges." *Rhodes v. Chapman*, 452 U.S. 337, 346, 101

---

**4.** Defendants' position on this appeal is seriously undercut by their briefs' failure to present to this court a legitimate state interest for any of

the practices the district court found unconstitutional.

S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (quoting *Rummel v. Estelle,* 445 U.S. 263, 275, 100 S.Ct. 1133, 1140, 63 L.Ed.2d 382 (1980)).

The district court followed this rule when it based its conclusions on an examination of case law, Oregon statutes and MacLaren regulations, the testimony of the experts, and juvenile justice standards. The court recognized that national standards "do not have the force of law," but that they do provide objective guidance from "juvenile corrections administrative experts whose advice is to be given presumptive validity by the courts." Opinion at 16 (citing *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462, and *Bell v. Wolfish,* 441 U.S. at 544, 99 S.Ct. at 1877).

Defendants contend that the experts testified as to what would be appropriate treatment, not as to whether the practices at D-1 were reasonably related to reform and discipline. This argument mischaracterizes the district court's use of the experts' testimony. That part of the expert testimony on which the district court relied concerned the effects of the challenged practices on the juveniles, both psychologically and physically. This testimony supports the district court's conclusions that "students are assigned to D-1 for punishment," that "long-term confinement to D-1 has been devastating," and that "[t]he absence of an adequate recreational program has a seriously debilitating impact on the D-1 students." Moreover, the district court used MacLaren's administrative rules and national institution standards in determining whether the practices at MacLaren were constitutional.

I believe therefore that the district court's use of expert testimony, Oregon's administrative rules, and national standards fully complied with the constitutional analysis required. *See Wells,* 777 F.2d at 1262 ("due process standards [for using restraints] is based on norms set by the mental health professionals"). I concur in the majority's conclusion that the district court correctly found that conditions at MacLaren violated the juveniles' rights to due process. Where we part company is over the question of whether the district court

abused its discretion in entering an extremely detailed remedial order as final judgment in this case.

As the majority correctly states, we review the scope of an injunction for an abuse of discretion. *Hoptowit I,* 682 F.2d at 1245–46. The majority concludes that the district court abused its discretion because the relief ordered against the state was broader than necessary to remedy the constitutional violations. However, this court will not "review an issue not raised below unless necessary to prevent manifest injustice." *International Union of Bricklayers Local Union No. 20 v. Jaska, Inc.,* 752 F.2d 1401, 1404 (9th Cir.1985). We have previously noted that "[i]n *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976), the Court suggested such cases be restricted to those where the proper resolution is beyond doubt or where injustice would otherwise result." *Lien Ho Hsing Steel Enter. Co. v. Weihtag,* 738 F.2d 1455, 1461 (9th Cir. 1984). Other circuits have held that this general rule applies to scope of injunction arguments. *See, e.g., Pawlak v. Greenawalt,* 628 F.2d 826, 831 n. 5 (3d Cir.1980), *cert. denied,* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981). Consequently, objections to injunctions generally must be first made to the district court prior to appellate review. The state is thus precluded from objecting to the scope of this injunction on appeal because it did not raise any argument as to the scope before the district court. When the defendants lead the district court "down the primrose path," as they did here, they cannot later complain that the district court's order was improper.

The district court, in its opinion filed in December 1984, ordered the parties to submit proposals "as to how relief should be fashioned." Opinion at 40. After several weeks of negotiations, the parties submitted the proposed order, which the district court adopted. The state claims that it only assisted with the "form of the judgment." However, from the correspondence contained in the Appellee's Motion to Supplement the Record, I conclude that the actions were true negotiations. Such ac-

tions constitute a waiver as to the scope of the injunction.[5] Moreover, even if these negotiations are not, in themselves, a waiver, the state failed to raise any objections to the scope of the order in the district court.

If the defendants believed that the court abused its discretion by issuing an order that went beyond the constitutionally required minima, they should have raised the issue below. In light of their failure to do so, and the egregious constitutional violations that resulted from conditions at MacLaren, I cannot agree with the majority that the district court judge abused his discretion.

Nevertheless, I am concerned that the detailed requirements of the district court's order may place an unmanageable burden of oversight and enforcement on the federal courts. Thus, I would rely on the supervisory power of this court to vacate and remand for further proceedings. This court has previously held that the judiciary may use its supervisory power to maintain its own institutional integrity. *United States v. Gonsalves*, 691 F.2d 1310, 1319 (9th Cir.1982). This court has also held, quoting the Supreme Court's opinion in *La Buy v. Howes Leather Co.*, 352 U.S. 249, 259–60, 77 S.Ct. 309, 315–16, 1 L.Ed.2d 290 (1957), that "supervisory control of the District Courts by the Courts of Appeals is necessary to proper judicial administration in the federal system," *Burton v. United States*, 483 F.2d 1182, 1187 (9th Cir.1973). A detailed remedial order such as the one at issue here may present intractable problems of enforcement, and may blur the boundary between the duty to ensure compliance with constitutional mandates and an overly intrusive intervention in the day-to-day management of a state facility. In such cases, I believe that deference to the concerns of federalism, and the need to preserve the integrity of the federal judicial system require us to use our supervisory power to vacate the district court's remedial order, although that court did not abuse its discretion in entering the order, and despite the defendant's failure to challenge the scope of the order in the district court.[6]

On remand, I urge the defendants to take heed that this court found no error in the district court's findings of fact nor in its conclusions as to the substantial constitutional violations arising from conditions at MacLaren. While the federal courts are properly mindful of the integrity of state management processes, they will not tolerate continuing constitutional abuses.

---

**5.** Thus, the plaintiffs likewise are precluded from challenging the injunction because it does not include any provisions for drug and alcohol treatment even though the district court made findings on that issue.

**6.** The supervisory power more frequently arises in the context of criminal proceedings rather than civil suits. *See* Beale, *Reconsidering Super-* *visory Power in Criminal Cases: Constitutional and Statutory Limits on the Authority of the Federal Courts*, 84 Colum.L.Rev. 1433 (1984). Where the institutional integrity of the federal judicial system is implicated, as here, the same policy concerns that underlie the resort to supervisory power in criminal proceedings apply with equal force in the civil context.