Bobby RIDDLE, By and Through his next friend and mother, Patricia BREWSTER; and M. Robert Riddle, Plaintiffs,

v.

Joyce H. INNSKEEP, Individually and in her official capacity as Director of Grant County Rehabilitation Center; David Jenks, Individually and in his official capacity as Counseling Supervisor of Grant County Rehabilitation Center; and Jeff Joseph, Defendants.

Civ. No. F 86–130.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Dec. 23, 1987.

R.T. Green, Mitchell, Hurst, Pinkus, Jacobs & Dick, Indianapolis, Ind., John R.

Wilks, Wilks & Kimbrough, Fort Wayne, Ind., for plaintiffs.

Michael K. Lulich, Hammond, Ind., for defendants.

## ORDER

WILLIAM C. LEE, District Judge.

Bobby Riddle was stabbed in the eye with a pencil by Jeff Joseph on April 8, 1985. Joseph had been committed to the custody of the Grant County Rehabilitation Center, a center for juveniles adjudicated delinquent. Joyce Innskeep, the Director of the Center, and David Jenks, the Director of Counseling at the Center, allegedly violated § 1983 (Riddle's eighth and fourteenth amendment rights) by failing to thoroughly investigate Joseph before admitting him to the Center and by failing to recommend Joseph's transfer, based on his misconduct while in the Center. The defendants have filed a motion for summary judgment. A telephone conference was held on September 23, 1987, and the defendants' motion is ripe for a ruling. For the following reasons, the motion is granted in part and denied in part.

## I.

### Summary Judgment Standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the nonmoving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* 106 S.Ct. at 2512; *Valentine v. Joliet Tp. High School Dist. No. 204*, 802 F.2d 981, 986 (7th Cir.1986).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact. *Celotex*, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 106 S.Ct. at 2511.

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 106 S.Ct. at 2512.

## II.

### Factual Background
#### A.

#### The April 8, 1985 Stabbing Incident

Plaintiff Riddle was stabbed by Joseph while in the process of telling Joseph that it was lunch time. (Riddle Dep., p. 15). Riddle told Joseph that it was time to eat—a teacher had instructed him to do so. (Riddle Dep., p. 16). Joseph told Riddle to shut up. (Riddle Dep., p. 16). Riddle again told Joseph to come and eat and Joseph began to make a derogatory comment about Riddle's mother. (Riddle Dep., p. 17). Riddle "tapped" Joseph on the head and a scuffle ensued. (Riddle Dep., p. 18). During the scuffle, Joseph struck Riddle in the eye with a pencil, allegedly causing severe and permanent injuries to Riddle's eye and brain. (Riddle Dep., p. 18; Complaint).

At the time of the incident, Riddle had completed his sentence at the Rehabilitation Center and was taking classes during the day. (Riddle Dep., pp. 12–13). Joseph was in the custody of the Rehabilitation Center at the time of the incident. At the time of the incident, Joseph and Riddle were friends. (Riddle Dep., p. 46). Riddle was larger and stronger than Joseph and was not afraid of Joseph. (Riddle Dep., p. 46).

#### B.

#### Jeff Joseph's Background

Jeff Joseph jabbed another student in the arm with a pencil in second grade. (Joseph Dep., p. 49). The force was sufficient to draw blood and Joseph was punished by the principal. (Joseph Dep., p. 49). Joseph was suspended in third grade for poking another student in the back of the neck, again with enough force to draw blood. (Joseph Dep., p. 50). Joseph again stabbed a fellow student in the fifth grade, while riding the bus. The injury was serious enough that the student was taken to the hospital so that the lead could be removed from his knee. (Joseph Dep., p. 52).

Joseph was placed in his father's custody after his parents divorced. His mother, Connie S. Reed, found her visits with him difficult and remembered specific problems such as shoplifting, destroying the neighbors' property and setting fires. (Reed Dep., p. 9). Jeff Joseph also threw matches on the dog, attempting to burn the animal. (Reed Dep., p. 11). In a fit of anger, Jeff Joseph broke the windows out of his grandparents' garage. (Reed Dep., p. 12). He kicked holes in the walls of Connie S. Reed's home, ripped curtain rods out of the wall, and broke a chair. (Reed Dep., p. 14). He also attempted to strike her husband, Richard Reed, on repeated occasions. (Reed Dep., p. 16).

After allegations that Jeff Joseph's stepmother abused him, he was sent to the foster home of a Rev. and Mrs. Diesler, by the Grant County Welfare Department. Joseph took a swing at Mrs. Diesler after being informed that he had to go to school even though he did not want to go. (Joseph Dep., p. 142). He was removed from the Dieslers' care.

From the Deislers', Jeff went to stay with his paternal grandparents, Denville and Faye E. Joseph. He repeatedly destroyed their possessions. (Reed Dep., p. 29). During this stay, he chased Rhonda Reese around the garage with a butcher knife. (Reed Dep., p. 29; Affidavit of Faye Joseph, p. 1; Joseph Dep., p. 54). When asked whether he would have stabbed Reese if he had caught her he answered, "As angry as I was, I probably would have." (Joseph Dep., p. 55). On occasions, Jeff Joseph threatened to burn his grandparents' home. (Joseph Dep., p. 144).

Not surprisingly, Jeff Joseph was taken from his grandparents' home in the fall of 1984 for evaluation and treatment at the Blackford County Mental Health Facility, where he remained for five weeks. Once, when told to go to his room, Joseph swung a stick at a staff member and a nurse. (Joseph Dep., p. 146). A second incident occurred after Joseph was placed on a restrictive diet. When told to give up some

food he had taken, he started throwing anything he could find. (Joseph Dep., pp. 10–11). He had to be placed in a straight-jacket. (Reed Dep., p. 38).

Upon release from the Blackford Mental Health Facility, Jeff returned to his paternal grandparents' home for another try. While visiting his mother, Joseph took a pair of sharp scissors and ran into his young stepbrother's room and threatened to kill family members and burn down the house. (Reed Dep., p. 42). Jeff Joseph only remembers threatening to stab himself with the scissors. (Joseph Dep., p. 35). When asked whether he had ever tried to stab his stepfather, Jeff replied, "No, I didn't have time." (Joseph Dep., p. 34). After this incident, Jeff Joseph was taken back to the Mental Health Center where he stayed for the night. After an initial and brief juvenile court inquiry, Joseph was placed in the Grant County Rehabilitation Center.

Prior to stabbing Bobby Riddle, Jeff Joseph demonstrated his violent and explosive temper on several occasions. He was placed in isolation for kicking a counselor in the groin. (Joseph Dep., p. 153). He hit a staff member in the leg with a brush (Joseph Dep., p. 66), destroyed property (Joseph Dep., p. 74), made a weapon during his stay, and kept a knife and file hidden from the staff (Joseph Dep., p. 78). By his own account, Joseph was placed in isolation approximately 20 times and possibly as many as 30 times. (Joseph Dep., p. 166).

## C.

### The Grant County Rehabilitation Center

The Grant County Rehabilitation Center is for juveniles between 13 and 17 years of age. (Pl.Ex. F3). The juvenile must either be adjudicated delinquent or must be a child in need of service and a ward of the Grant County Department of Public Welfare. (Pl.Ex. F3). The purpose of the Center is to help residents cope with life situations and to develop resources to become stable, productive community members.

There are a number of criteria for admission to the Grant County Residential Treatment Center. (Pl.Ex. F3). "The juvenile must not have severe emotional disturbances." (Pl.Ex. F3). It is the duty of the Director and Counseling Supervisor of the Center to determine whether a candidate meets the criteria for the program. (Pl.Ex. F1). The Director is responsible for pre-placement interviews. (Pl.Ex. F1). The Counseling Supervisor assists the Director with preplacement interviews and makes recommendations and suggestions whenever possible. (Pl.Ex. F2).

As a part of the preplacement interviewing process, each candidate is to undergo a complete psycho-educational, social, and medical evaluation, including:

(a) An in-depth family history including a brief history of the parents' background, the economic condition of the home, the vocational or occupational status of the parents and all other pertinent information regarding their educational background, current and past health history, and the circumstances surrounding the conception, pregnancy, birth, and early developmental processes of the residential candidate. Future general family dynamics will be explored and noted.

(b) The educational records of the candidate including grades, achievement test scores, and behavioral reports.

(c) A complete medical history and a new medical evaluation to assess the current functional level of the youth.

(d) A complete history of any past referrals of the youth to juvenile or civil authorities.

Information for the history will be obtained from the youth, the parents or caretaker of the youth, school officials, relatives, law enforcement officials, medical and mental health professionals, and other social service agencies as needed. Information gathered from these sources will be compiled and placed in a written report which will contain identified needs and specific treatment goals. This report will be submitted to the Juve-

nile Court for consideration and disposition. . . .

(Pl.Ex. D2).

A number of facts strongly suggest that Director Innskeep and Counseling Supervisor Jenks did not complete a thorough pre-placement investigation. Joseph's natural mother, Connie S. Reed, and Faye E. Joseph, Joseph's paternal grandmother, testified that they were not questioned about defendant Joseph's background. (*See* Affidavit of Reed and Faye Joseph). Before plaintiff Riddle was stabbed, Connie S. Reed spoke with various people at the Rehabilitation Center inquiring about Joseph's status and offering to become involved with counseling or therapy, but her offers were never accepted. (Affidavit of Reed, pp. 2–3; *see also* Reed Dep., p. 61). Jeff Joseph was questioned about his past by Joyce Innskeep only in a cursory manner. (Joseph Dep., pp. 46, 48).

On November 7, 1984, Dr. May Palacios, a clinical psychologist, diagnosed Jeff Joseph as needing:

1. Placement in a highly structured group setting where there is focus on accountability, consequences of behavior, and adherence to the rules.

2. Intensive psychotherapy for Jeff focusing on his negative self-concept, his feeling of being a failure, and his feeling of rejection and alienation.

(Pl.Ex. 1). In his deposition, Dr. Palacios noted that Jeff Joseph was at the time of his admission to the Center a violent and emotionally disturbed child. (Palacios Dep., pp. 25–26). Moreover, Dr. Palacios would not have recommended a child such as Jeff to a nonviolent facility which does not accept youths with severe emotional problems. (Palacios Dep., p. 26).

Counseling Supervisor Jenks stated in his deposition that juveniles with uncontrollable or unpredictable tempers could be considered non-candidates for the Center. (Jenks Dep., p. 11). Counseling Supervisor Jenks testified that Joseph would not have been an acceptable candidate for the Center, assuming he was angry, manipulative, impulsive, explosive, self-centered, and assuming that he had an uncontrollable temper, had chased a family with a butcher knife, and assuming that he had held family members at bay with a pair of scissors.

A resident's progress at the Center is noted through progress reports from teachers and counseling staff members. (Pl.Ex. D3). A file is kept on each resident containing documentation of all counseling contacts and "any and all information ..." (Pl.Ex. D3). During his stay before the stabbing incident, Joseph was involved in various episodes which warranted some form of disciplinary action. These episodes included uncontrolled anger and destruction of property (Pl.Ex. E1), fighting (Pl.Ex. E2), disobedience (Pl.Ex. E3), and name calling (Pl.Ex. E4, 5).

### III.

### *Analysis*

The plaintiffs' eighth and fourteenth amendment claims are made through 42 U.S.C. § 1983 (1982). To prevail, the plaintiffs must prove two essential elements: that the conduct complained of (1) "was committed by a person acting under color of state law" and (2) that the conduct complained of "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). There is no dispute that the defendants in this case were acting under color of state law. The dispute is whether the defendants' actions deprived the plaintiffs of privileges, or immunities secured by the Constitution of the United States.

### A.

### *The Plaintiffs' Eighth Amendment Claim*

Plaintiff Bobby Riddle seeks the protection of the eighth amendment. Among other things, the eighth amendment prohibits cruel and unusual punishment. *Whitley v. Albers*, 475 U.S. 312, 106

S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986). While some courts have refused to apply the eighth amendment to juvenile detention facilities, *Gary H. v. Hegstrom,* 831 F.2d 1430 (9th Cir.1987), the Seventh Circuit has extended eighth amendment protection to juveniles confined at a medium security boy's school. *See Nelson v. Heyne,* 491 F.2d 352, 355 (7th Cir.1974), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). The Seventh Circuit's position makes a great deal of sense, and as one court has noted, "[i]t would not be unreasonable to assume that society's conscience might be shocked by the conditions of confinement imposed on a juvenile in an isolation cell, when it would be unwilling to label the same treatment, given to an adult, cruel and unusual." *Santana v. Collazo,* 714 F.2d 1172 (1st Cir.1983). In a nutshell, juveniles ought to receive protection at least as great as that afforded adult prisoners.

▮ But in this case, the complaint itself states that "Bobby Riddle was attending school at the Rehabilitation Center *after he had fulfilled his court ordered commitment* to the Rehabilitation Center." The cruel and unusual punishment clause was designed to protect those convicted of crimes and consequently the clause applies "only after the state has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Ingraham v. Wright,* 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 1412 n. 40, 51 L.Ed.2d 711 (1977). For that reason, the more protective fourteenth amendment standard applies to conditions of confinement when detainees, whether or not juveniles, have not been convicted. *See, e.g., Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (involuntarily committed mental patients); *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979) (adult pretrial detainees); *Ingraham* (students disciplined at school). The eighth amendment does not apply to those who have not been convicted because those who have not been convicted and who are not in custody may not be punished at all, making the cruel and unusual punishment inquiry irrelevant. The same is true for those who have fulfilled a term of imprisonment and are no longer in custody. They may not be punished at all and the eighth amendment's prohibition of cruel and unusual punishment goes beyond the proper inquiry. The eighth amendment prohibition against cruel or unusual punishment "is not applicable to cases in which the plaintiffs were not in custody as a result of having been convicted of a crime." *Lynch v. Cannatella,* 810 F.2d 1363 (5th Cir.1987). On April 8, 1985, Bobby Riddle was a day student at the Rehabilitation Center and was waiting for the Marion Community School System's next term to begin. He was not in custody pursuant to a conviction. He could not, therefore, be punished at all and the proper inquiry is whether or not he was deprived of any liberty interest under the fourteenth amendment.

▮ The applicability of the eighth amendment may be an academic question, in any event, since Riddle is clearly entitled to fourteenth amendment protections, which one court has deemed "more protective." *See Hegstrom, supra.* Even if the eighth amendment applied the defendants would be entitled to summary judgment. Liability under the eighth amendment requires punishment and punishment requires, "at a minimum, that the prison officials have realized that there was imminent danger and have refused—consciously refused, knowingly refused—to do anything about it." *See Duckworth v. Franzen,* 780 F.2d 645, 653 (7th Cir.1985). The Supreme Court quoted the *Duckworth* standard with apparent approval in *Whitley,* 106 S.Ct. at 1085.

It is alleged that Innskeep and Jenks failed to conduct a thorough intake interview and failed to remove Jeff Joseph from the Rehabilitation Center after he had been disciplined for a variety of misconducts. However those failures are classified (negligence, gross negligence, recklessness, etc.) they do not amount to punishment and it is punishment that a plaintiff must prove to establish an eighth amendment claim. Even the grossly negligent failure to foresee a danger (in this case the danger that

Jeff Joseph would stab Bobby Riddle) does not amount to punishment. *See Duckworth*, 780 F.2d at 653. Seventh Circuit cases require the plaintiff to "prove deliberate or callous indifference, evidence by an actual intent to violate the inmate's rights or reckless disregard for the inmate's rights, in order to prevail on an eighth amendment claim." *Shelby Co. Jail Inmates v. Westlake*, 798 F.2d 1085, 1094 (7th Cir.1986). There are no genuine issues of material fact which would preclude summary judgment on plaintiff's eighth amendment claim. While the defendants might be guilty of something for their alleged failures they have not violated the eighth amendment.

The defendants are entitled to summary judgment on the eighth amendment portion of the plaintiffs' § 1983 claim. The eighth amendment does not apply in this case. If it did, the proof is insufficient to show that it was violated.

### B.

### *The Plaintiffs' Fourteenth Amendment Claim*

The real heart of this case is the plaintiffs' § 1983 claim for violation of the fourteenth amendment, for substantive due process violations. There can be no doubt that plaintiff Riddle has a liberty interest in personal security or bodily integrity. *See, e.g., Youngberg v. Romeo*, 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982); *Ingraham v. Wright*, 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977); *DeShaney v. Winnebago Co. Dept. of Social Services*, 812 F.2d 298, 301 (7th Cir.1987); *Fernandez v. Leonard*, 784 F.2d 1209, 1214–15 (1st Cir. 1986). The real question is whether plaintiff Riddle was deprived of this liberty interest by the state (Innskeep and Jenks), in a federal constitutional sense.

There are two possible theories on which the defendants might be thought to have violated plaintiff Riddle's constitutional rights. First, they might be thought to have deprived him of a right to be protected from Jeff Joseph. Second, they might be thought to have in some way been complicit in the stabbing, so as to deprive him of his liberty interest.

█ The first theory is foreclosed by the rule that the state's failure to protect people from private violence or other mishaps not attributable to the conduct of its employees, is not a deprivation of constitutionally protected liberty. *See, e.g., Walker v. Rowe*, 791 F.2d 507, 510 (7th Cir.1986); *Ellsworth v. City of Racine*, 774 F.2d 182, 185 (7th Cir.1985); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982). The First, Eleventh and District of Columbia Circuits have adopted the Seventh Circuit's view. *DeShaney*, 812 F.2d at 301. All of these cases are based on the principle that the constitution is a charter of negative rather than positive liberties. The fourteenth amendment prohibits states from depriving individuals of their life, liberty, or property without due process of law, but generally it does not create a judicially enforceable right to a minimum level of governmental services or governmental protection. *Archie v. City of Racine*, 826 F.2d 480, 486 (7th Cir.1987). This court does not therefore think that the plaintiffs can complain that the defendants failed to protect Bobby Riddle from Jeff Joseph. But the plaintiffs can complain that the state was somehow complicit in Bobby Riddle's stabbing, by its failure to conduct thorough preplacement interviews and by its failure to remove Jeff Joseph from the program after discovering his violent propensities.

█ Of course, "the word 'deprived' in the Due Process Clause connote[s] more than a negligent act." *Archie*, 826 F.2d at 487, *quoting Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Historically, the guarantee of due process has been applied to deliberate decisions of governmental officials to deprive a person of life, liberty or property. *Archie*, 826 F.2d at 487. Thus, § 1983 does not impose liability for violations of duties of care arising out of tort law. *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed. 2d 405 (1976) (fourteenth amendment is not a "font of tort law").

While negligence will not support liability under § 1983, liability may exist if a "special relationship" exists between the state and an individual. In special relationship cases, the state will be liable if it exercises (or fails to exercise) its power in an unconstitutional manner, given the totality of the circumstances, including the relationship between the state and the plaintiff. *Archie*, 826 F.2d at 497. The concept of special relationships began in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976), where the Supreme Court held that deliberate indifference to an inmate's serious medical needs violated the eighth amendment. The Court reasoned that elementary principles of eighth amendment jurisprudence require the government to provide medical care for those it incarcerates because the government is the only means inmates have of satisfying their medical needs. *Id.* at 103, 97 S.Ct. at 290. Some courts have held that the concept of special relationships was intended to extend only to prison or prison-like environments. *See Harpole v. Arkansas Dept. of Human Services*, 820 F.2d 923, 927 (8th Cir.1987).

The Seventh Circuit, after reviewing a line of special relationship cases, recently held that a special relationship exists when "the state has exercised control over the person's movements or accepted responsibility for the person's care or cut off private sources of aid or markedly increased a particular person's risk of danger from others or in some other way assumed a special relationship with a particular person." *Archie*, 826 F.2d at 497. In *Archie*, the court found the existence of a special relationship where a fire department dispatcher failed to provide rescue services requested by a woman who had called on the telephone requesting rescue services. The court reasoned that in advising the caller to remain at her apartment and to breathe into a paper bag (the dispatcher thought the caller was hyperventilating), the dispatcher had deliberately assumed control over the caller's physical welfare. *Id.* at 497. "A special relationship could be found based on Giese's [the dispatcher's] exercise of constructive control over DeLacy [the

caller], and his possibly reckless and arbitrary refusal to send an ambulance...." *Id.* The Seventh Circuit's holding in *Archie* gives a rather expansive definition of the concept of special relationships which this court is bound to follow.

Special relationships have been found in cases analogous to this one. In *Taylor by and through Walker v. Ledbetter*, 818 F.2d 791 (11th Cir.1987) (en banc) the Eleventh Circuit held "that a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a section 1983 action for violation of fourteenth amendment rights." *Id.* at 797. The court recognized that the "relationship between state officials charged with carrying out a foster child care program and the children in the program is an important one involving substantial duties and, therefore, substantial rights." *Id.* "If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit. It is on this theory that state prison personnel are sometimes held liable under section 1983 for violence of one prison inmate against another." *Id.* at 797–98 (*quoting Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982)). Similar results have been reached in other analogous cases. *See, e.g., Doe v. New York City Dept. of Social Services*, 649 F.2d 134 (2d Cir.1981); *Estate of Bailey by Oare v. County of York*, 768 F.2d 503, 510–11 (3d Cir.1985).

In this case, the Grant County Rehabilitation Center had assumed a special relationship with plaintiff Bobby Riddle. Under the Seventh Circuit's holding in *Archie*, the Rehabilitation Center had "exercised control" over Riddle's movements and "accepted responsibility" for Riddle's care and increased Riddle's risk of danger from others. *Archie*, 826 F.2d at 497. This is true even though Riddle's custodial sentence was over. Because a special relationship existed, the defendants may be held liable if the plaintiff can show that their

**1162**

failure to conduct a thorough intake interview and their failure to transfer Jeff Joseph from the program manifested deliberate indifference to Bobby Riddle's safety.

The deliberate indifference standard was employed in *Ledbetter. See Ledbetter*, 818 F.2d at 797. In *White v. Rochford*, 592 F.2d 381 (7th Cir.1979), the Seventh Circuit held that "indifference in the face of known dangers certainly must constitute gross negligence," reversing the dismissal of a complaint alleging the police who had arrested the driver of a car had subjected three passenger children to a health endangering situation by abandoning them. In *Doe*, the court thoroughly discussed the close affinity of the concepts of gross negligence and deliberate indifference, in reversing a district court for conveying an impression that deliberate indifference requires a higher degree of knowledge, ill will and culpability than is actually the case. In that case the court had charged the jury that:

> In a federal court case, negligent care or negligent oversight by a child care agency or foster parents does not prove a claim for deliberate mistreatment, does not prove a constitutional claim. Negligence or carelessness or unintentional fault do not constitute violation of a constitutional right. If that occurred, the defendant is entitled to your verdict.

*Doe*, 649 F.2d at 142. After the charge was read, the jury passed a note to the district court judge asking "as a legal question, is not investigating a situation thoroughly a denial of one's constitutional rights?" The district court judge repeated verbatim the above instruction. The court of appeals held that the district court was right in stating that ordinary negligence is not enough to support a cause of action under § 1983, but that the district court erred in not instructing the jury that grossly negligent conduct could support liability under § 1983. *Id.* at 143–44.

The proper standard in a case like this is difficult to identify. The Seventh Circuit recently said "that not all reckless conduct by state actors rises to the level of a constitutional violation." *See Archie*, 826 F.2d at 495 (citing *DeShaney, supra*). Even the deliberate indifference standard may not be applicable in some situations, such as a prison-riot context, where that standard would not adequately reflect the importance of competing obligations and the conditions under which decisions are made. *See, e.g., Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). This case is analagous to *Doe* and *Ledbetter* and the appropriate standard is gross negligence or deliberate indifference. Mere negligence is not enough.

It is very difficult to distinguish between negligent conduct and conduct which rises to an unconstitutional level. *Archie*, 826 F.2d at 494. It is clear, however, that the determination of whether the conduct is actionable "requires an understanding of the totality of the circumstances of the case...." *Id.* at 493. It is also clear that when a special relationship exists, "a court is more likely to find that a failure to act rises to the level of a constitutional violation because the state actor is on notice of the need to protect a particular person, as opposed to a member of the general public, and is less likely to have an adequate reason for failing to act." *Archie*, 826 F.2d at 498. "[T]he more important the relationship and its attendant duties, the more likely it is that an act or omission on the part of one party has a potential to deprive the other of a constitutional right." *Ledbetter*, 818 F.2d at 797–98.

█ In *Archie*, the Seventh Circuit held that to find liability "the trier of fact on remand will have to determine that Giese [the dispatcher] had reason to foresee that there was substantial risk that DeLacy might die or suffer grievous harm if rescue services were withheld and that he deliberately and consciously imposed such a risk on DeLacy." *Id.* at 493. It went on to hold that an honest error or mistaken judgment would not be enough. *Id.* Despite the defendants' argument to the contrary, the court is not in a position to grant summary judgment. To do so it would have to hold that there are no genuine issues of material fact relating to the defendants' failure to conduct a thorough

preplacement interview and relating to the defendants' failure to transfer Jeff Joseph after various acts of misconduct (both destruction of property and violence aimed at others). It may well be that the "totality of the circumstances," *Archie,* 826 F.2d at 493, will reveal that the defendants' actions were merely negligent and will not support § 1983 liability. But the court cannot properly make that judgment at this juncture.

■ The plaintiffs still have to prove a causal connection between Bobby Riddle's injuries and the defendants' allegedly unconstitutional conduct to prevail under § 1983. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980). That is because the possibility that state inaction might be deemed a remote or trivial proximate cause of a plaintiff's injury is not enough to establish a violation of the fourteenth amendment. *DeShaney,* 812 F.2d at 302. A "constitutional tort" requires deprivation by the defendant, and not merely a failure to protect the plaintiff from a danger created by others. *Id.* No deprivation will have taken place if the state's inaction is found to have only brought about a trivial increase in the probability that Jeff Joseph would stab Bobby Riddle. But this too is a factual question. *Estate of Bailey,* 768 F.2d at 511; *Archie,* 826 F.2d at 498–99. There is evidence, by way of Jenks' deposition testimony, that Joseph would not have been admitted to the program if a proper preplacement interview would have been conducted and if, through that interview, the defendants would have discovered the details of Joseph's violent background and emotional problems. It is also possible to draw a causal connection between the defendants' failure to transfer Joseph and the plaintiff's injuries. These questions raise genuine issues of material fact and it cannot be said on summary judgment that the defendants' failure to act only added a trivial increase to the probability that Riddle would be injured. The fact finder may very well draw that conclusion at a later date but the court is unwilling to draw that conclusion presently.

## IV.

### *Conclusion*

The proper inquiry in this case is whether plaintiff Riddle was deprived of a liberty interest. The defendants' motion for summary judgment on the plaintiffs' § 1983 claim for violations of the eighth amendment is GRANTED.

As a former inmate at the Rehabilitation Center and as a day student, Riddle had a special relationship with the Center. If, in failing to follow their own policies regarding preplacement interviews, and in failing to transfer Jeff Joseph after discovering his violent propensities, it can be said (viewing the totality of the circumstances) that the defendants' failures to act amounted to deliberate indifference or gross negligence, then they will be liable to the plaintiffs under § 1983. This determination, as well as the determination of whether their inactions caused Riddle's injuries can only be made at trial. Accordingly, the defendants' motion for summary judgment on the plaintiffs' § 1983 claim for violation of the fourteenth amendment is DENIED.